UNITED STATES of America,
Plaintiff-Appellee,

v.

Lloyd BALLIVIERO,
Defendant-Appellant.

No. 82–3413.

United States Court of Appeals,
Fifth Circuit.

May 2, 1983.

---

Defendant Lloyd Balliviero was indicted for and convicted of conspiracy to possess with intent to distribute marihuana, possession with intent to distribute marihuana, conspiracy to import marihuana, importation of marihuana, and participation in a continuing criminal enterprise. He was sentenced to a term of thirty years in prison and fined $100,000.

The scheme in which Balliviero was involved took place in Louisiana, not far from New Orleans, where, in 1979 and 1980, he assisted in the importation of more than 350,000 pounds of marihuana. The importation scheme proceeded in the following manner. The Colombian-grown marihuana was shipped from Colombia to a spot about ten miles off the coast of Louisiana. It is here that the American activity began. A barge, pulled by a tugboat and accompanied by a crewboat, was sent out to the "mother ship." The barge would pull up to the side of the ship and the transfer would begin. About eight hours later, the barge was loaded with marihuana and ready to begin the trip into the United States. The barge was towed back to the coast and then up a series of canals and rivers until it reached its destination: Hero Canal. There, under cover of darkness, the barge was unloaded, the bales of marihuana transferred to large trucks and the journey to distribute the marihuana throughout the country would begin.

Balliviero's role in this venture was pilot of the crewboat full of workers who off-loaded the marihuana. He also brokered deals for a man known under a variety of names including Ralph Jackson and Jack Wells since Balliviero owned an area business named Central Marine Transport, Inc., and could make such large purchases without arousing suspicion. It is undisputed that he brokered a number of purchases for Mr. Jackson, including the purchase of a barge for $70,000 and a tugboat for $170,000. It was defendant's testimony that he was simply a legitimate businessman, who happened to be involved, unbeknownst to him, in business deals with marihuana smugglers. He contends that he simply

Michael J. Osman, Miami, Fla., for defendant-appellant.

John P. Volz, U.S. Atty., John Patrick Deveney, Harry W. McSherry, Jr., Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before RUBIN, GARZA and WILLIAMS, Circuit Judges.

**PER CURIAM:**

Convicted below of nine counts of marihuana related criminal activity, defendant brings this appeal to challenge the limitations imposed upon his cross-examination of certain government witnesses, as well as the court's exclusion of certain evidence. After a thorough review of the record, we conclude that he had ample opportunity to delve into all relevant topics including the possible motives for the adverse testimony, and the judge, therefore, did nothing improper in cutting off cross-examination when he did. He also committed no error in refusing to permit the introduction of certain irrelevant and prejudicial items of evidence. Accordingly, we affirm the district court's judgment.

carried out legitimate brokering activities. The government naturally presented a different scenario through a series of witnesses who testified that they came in contact with Balliviero on the smuggling missions.

■ The cross-examination of three government witnesses is the subject of the first portion of defendant's appeal. He maintains that the district judge impermissibly cut off cross-examination which would have exposed the fact that the witnesses had lied in court and were not credible. In conducting an examination of the sufficiency of the permitted cross-examination, it is important to recognize that the sixth amendment does not mandate unlimited cross-examination. Although cross-examination is certainly a crucial tool for a defendant to expose his case to the jury, it may reach a point where it becomes repetitious or simply confuses the jury with a host of collateral matters. At this point, the judge is permitted to step in. As a gauge to determine the adequacy of the permitted cross-examination, we look to *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), where the Supreme Court stated that in order for cross-examination to satisfy the sixth amendment, the defendant must be "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." 415 U.S. at 318, 94 S.Ct. at 1111.

■ Balliviero first challenges the limitation of his cross-examination of Paul Hindelang, a confessed drug smuggler. Hindelang testified that he had seen Balliviero only once, when he was on a crewboat piloted by the defendant which went out to the mother ship. He stated that he had only talked with Balliviero about navigational hazards and his ability to navigate the boat; they did not discuss defendant's role in the smuggling operation. Nonetheless, his testimony was very damaging to defendant because the location at which he talked to defendant—on a crewboat going out to unload marihuana—indicates that Balliviero was informed about the nature of the business in which he was involved. Furthermore, he related to the jury conversations with other members of the smuggling conspiracy in which Balliviero's activities were discussed.

The defense conducted an extensive cross-examination of Hindelang, which lasted for more than a day and one-half. In the course of that examination, Hindelang was questioned in detail about his family history, his activities in marihuana smuggling both before and after his contact with Balliviero, his plea bargain agreement with the government and the advantages he had gained therefrom, his bond reduction hearing, and the murder of Jackson, as well as the intimation that he might be involved. The only complaint made about the scope of the cross-examination of Hindelang is that counsel was prevented from calling a D.E.A. agent to testify about whether Hindelang had admitted ownership of various properties in the U.S. and a multi-million dollar interest in a cable television company in Costa Rica, which were acquired with the proceeds from his criminal activities.

The judge did permit extensive questioning of Hindelang about the extent of his illegally obtained assets, which he pledged to give up in his plea bargain agreement. In fact, a review of the record demonstrates that defense counsel asked Hindelang about the exact information to which the D.E.A. agent would have testified. Hindelang did not deny that the agent had testified previously that he owned a cable television company in Costa Rica and numerous properties in the United States. In fact, he implicitly admitted this. He did dispute, however, the accuracy of the statements made by the agent. The following excerpt of defense questioning confirms this.

Q   Isn't it a fact, sir, that during your association with Agent John Donald of the Drug Enforcement Administration, when he was working in an undercover capacity, that you had many conversations with him in which you discussed farmlands and that you told him that you owned approximately 22 farms or sections of farmland in Ar-

kansas, plus properties in Illinois, Mississippi and Montana?

A No, that was false. Mr. Donald knew it was false.

Q So you're stating here under oath that Drug Enforcement Administration Agent John Donald testified falsely before the United States magistrate?

A In that particular case, I am saying what he said was not correct.

Q Did you ever tell Agent John Donald during the investigation that he was conducting, when he was working with you undercover, that you owned a couple of houses in the Florida area that you used as a safe house to store quantities of marijuana?

A No, sir.

Q So that if Mr. Donald testified under oath about that before the United States magistrate, he would be lying?

A Can I clarify the situation, please?

Q Certainly.

A We most certainly talked about farmland. We most certainly talked about research that I was doing about farmland, and at no time did I ever say that I owned any farms or do I own any farms anywhere. And we also talked about houses in Miami and which I had rented, and at no time did I ever state that I owned or didn't own them. I just said I had stash houses in Miami.

Record on Appeal, vol. 5, at 163–64.

The trial judge committed no error in refusing to permit defendant to question the D.E.A. agent about this collateral matter. Furthermore, we fail to understand the alleged prejudice to defendant's case occasioned by this ruling. Hindelang admitted that the agent had testified about his assets.

■ The second claim of improper limitation of cross-examination relates to government witness David Hart. First, Balliviero claims that he was denied the opportunity to present a prior inconsistent statement about who paid Hart's attorney's fees in a

different prosecution. The introduction of this information, however, would have certainly been repetitive since Hart admitted on the stand that Jackson might have paid his attorney's fees.

> Hart: I mean, you know, Jack Wells [Jackson] might have paid Whitice and Whitice paid the bondsman. I don't know. That is—you know, I don't know that part of it.

Record on Appeal, vol. 6, at 141.

Defendant contends that the point of eliciting this testimony was to demonstrate that Hart had a reason to downplay Jackson's participation in the scheme and implicate Balliviero instead. He was allowed to make this point, and the judge certainly had the right to prohibit him from restating it ad nauseum.

■ Balliviero also challenges the trial court's refusal to allow extrinsic evidence to show Hart made a prior inconsistent statement that he and other conspirators in a separate case had agreed to concoct a story about who was to blame for the charge. Again, defense counsel has mischaracterized the record in this case. Hart never denied that he had made such a statement; he only said that he did not remember doing so.

Q Do you recall, sir, in the end of May or beginning of June, 1981, making a statement to Agent Eaton and telling him with regard to that meeting that Wells said that he was aware the arrest warrants existed for Pat Phil and Jack Wells, and he said, "Put it all on Herb Alleman and Jack Wells, that no one knows who Jack Wells really is"? And that Kilcoyne, Dunan, and you agreed to go with Wells' story, and the meeting adjourned?

Do you recall making that statement to Agent Eaton?

A No, I don't, sir.

Q Do you deny making that statement to Agent Eaton?

A *I don't deny it, but I don't remember making it.*

Record on Appeal, vol. 6 at 147–48 (emphasis added).

Since there is no denial that the statement was made, there is clearly no rationale for the introduction of a prior "inconsistent" statement about the incident.

█ As a final challenge to the cross-examination of Hart, defendant asserts that he was improperly denied the opportunity to impeach Hart concerning the date on which they first met. On direct examination, Hart testified that he first came to Louisiana in August of 1979 and met Balliviero on that trip. Balliviero contends that Hart told a D.E.A. agent that he first came to Louisiana in November of that year. Although the agent was not allowed to testify, it is clear from the record that defendant had adequate opportunity to expose to the jury that the agent had used the November date in his report of Hart's statement.[1] Hart either lied or was confused about the dates. The defense examination of Hart revealed this to the jury.

Both parties recognize that this is not a collateral matter. We have long recognized that "while the scope of cross-examination is within the discretion of the trial judge, this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." *United States v. Bass,* 490 F.2d 846, 858 n. 12 (5th Cir.1974). *See also United States v. Elliott,* 571 F.2d 880, 908–09 (5th Cir.1978). However, the record reveals that defendant was allowed the opportunity to "expose to the jury the facts from which jurors, as the sole trier of fact and credibility, could appropriately draw inferences relating to the reliability of the witnesses." *Davis v. Alaska,* 415 U.S. at 318, 94 S.Ct. at 1111. Consequently, we find that the restriction on cross-examination did not rise to the level of a violation of defendant's sixth amendment rights.

1. The cross-examination of Hart on this particular point proceeded as follows:

Q Now, sir, when was it that Jack Wells first contacted you—strike that.
When was it that you first met Jack Wells?
A I would say it was June or July of '79.
Q Wasn't it actually around September 15th of 1979?
A Could have been. As I say, it was in the summer because I—I know it was when I came over to look at the vessel over here that—
Q Didn't you tell Agent Eaton, in May of 1981, that you first met Jack Wells on or about September 15th, 1979?
A I don't know whether I told him that or whether I came over here September 15th, 1979. I think I met Jack Wells two or three weeks earlier and he made arrangements for me to come over here. It is right in that area.
Q Is it that you don't remember or you deny that you told Agent Eaton that you first met Jack Wells on or about September 15th, 1979?
A I don't remember.
Q You don't remember?
A No.
      *    *    *    *    *    *
Q Now, I believe, on direct examination, you testified that you first came—or the first time you came to New Orleans to look at the tugboat was in August of 1979, is that true?
A Yes, and that is why I say I must have met Mr. Wells earlier than September, and

I believe it was because I came over just to look at the tugboat and I believe it was in August and I came over again in September.
Q Did you tell Agent Eaton, on May 29th or thereabouts, in 1981, that in November of 1979 Wells called you and gave you a progress report on the tugboat and barge and suggested that you travel to New Orleans to inspect the equipment?
A True.
      *    *    *    *    *    *
Q Which is it? When did you first come to New Orleans, in August or November of 1979?
A It was in August. It was at least August, and I believe again in September, and it could be again in November. Could have been three times. I came over two or three times to look at the vessel, one time to operate the vessel just briefly.
Q I am talking about the first time.
      *    *    *    *    *    *
A I say in August.
Q Now, sir, when you came to New Orleans, whenever the first time was, you were shown the tugboat by Mr. Wells?
A No, sir.
Q You didn't see the tugboat?
A Yes, sir.
Q All right, you saw the tugboat?
A Yes, sir.
Q You had an occasion to meet my client, Mr. Balliviero, on that occasion?
A Yes.
Record on Appeal, vol. 6 at 116–20.

■ Balliviero makes his final attack on the limitation of cross-examination of government witness Phil Whitezell. Whitezell was the last of the "insider" witnesses, who were involved in the drug smuggling operation and later cooperated with the government in exchange for which the government agreed to drop some of the charges against them. Defendant asserts that he was improperly denied the opportunity to question a D.E.A. agent about whether Whitezell had mentioned a specific marihuana shipment in his statement. Whitezell stated at trial that he had neglected to mention one load of marihuana because of tax consequences. Later in his testimony, he also admitted that he might not have been truthful to the agent in his initial interview.

Q  Now, sir, how many marijuana runs did you go on, forgetting the aborted mission, the first ones you didn't meet the mother ship?

A  There were three on the LOIS CROSBY, and one on the PEE WEE for me.

Q  Do I understand you correctly to say that you were on all three trips?

A  That's right.

Q  Did you tell Agent Eaton when he interviewed you, in October of 1981, that you in fact had been on all three trips?

A  No, I left out one of the trips.

Q  You left out one of the trips?

A  Yes, I did. When I went in, it was stated to me, well, we know about both deals that went good, and we know about the one attempt. And I didn't tell them about the third deal because—well, because of the IRS. I am trying to clean up now, and, you know, I have to make a statement that I did this, and I left out one of the trips.

Q  And the trip you say you left out was the third trip?

A  No, it was the second trip, the split trip.

Q  Well, the split trip, was that the trip where the—after the offloading operation the barge was only partially full of marijuana?

A  It was at first, you know. The first trip we went out we missed the boat, and then we went out and found her and got some. Then we had to go out and get the rest.

Q  You are absolutely certain that was the second load?

A  That's right.

Q  And you are saying you did not tell Agent Eaton about this second load?

A  That's right.

Q  You are absolutely certain about that?

A  That's right.

Q  You are absolutely certain about that?

A  That's right.

        *    *    *    *    *    *

Q  In October of 1981, did you make a statement to Agent Eaton that the transfer of marijuana was completed about two hours before dawn and the offloaders returned to the crewboat and the three vessels untied and departed, and that the LOIS CROSBY and the barge which was only partially full of marijuana returned to the mouth of the Mississippi River and continued upstream on a 2½-day journey? Do you recall making a statement to him like that?

A  When I first went to Brent, it was the first time I spoke to anybody. I was really not steady at all. I just was really not steady, and I don't recall exactly what I told Brent.

I know the statements I told him about Charlie Smith were true and correct, but the deals I don't—I don't remember what I told him, and I don't remember if I was completely truthful in all my statements.

Record on Appeal, vol. 7, at 73–76.

As the record excerpt indicates, Whitezell admitted that he may have lied to the agent. It is this statement that allows counsel to successfully attack the credibility of this witness. At trial, the witness admitted his participation with the second load of marihuana. It is about this participation

that the D.E.A. agent would have testified. The D.E.A. agent, therefore, would have simply confirmed that Whitezell did not lie to him initially. We are unable to comprehend how the credibility of this witness would have been attacked by the revelation that Whitezell gave the same information at trial as he did to the agent.[2] This would have served only to restore his credibility.

Next, Balliviero complains about the court's exclusion of the government's Demand for Alibi. The Demand for Alibi listed dates that allegedly corresponded to the shipments of marihuana. The first date, however, did not correspond to the actual date of the offloading. The defense believes that Whitezell supplied the information which led to the preparation of this Demand for Alibi. Defense counsel sought to introduce it and then impeach Whitezell since he had not mentioned the first date anywhere in his testimony. The fatal flaw in this argument is that the prosecutor stated on the record that he had specified the dates on the Demand for Alibi. He added that the dates did not come from Whitezell. The court, therefore, properly exercised its discretion in excluding evidence that would have served only to confuse the jury.

Balliviero also maintains that he should have been permitted to introduce a promotional videotape for his company, Lloyd's Industries, in order to show that the company was not simply a sham enterprise but was a functioning corporation involved in legitimate business activities. This videotape was properly excluded since the defendant and two accountants had argued at length that the company was a legitimate and profitable enterprise. The tape would have been repetitive, and it was well within the court's discretion to exclude such cumulative evidence. Furthermore, the government never contended that this business was a sham operation. In fact, it was Balliviero's operation of a legitimate business that made him so attractive to the drug smugglers who initially contacted him.

The court's refusal to show another videotape, a television interview with one of Balliviero's employees, is also challenged here. P.M. Magazine produced an interview with Nancy Mann, who was employed as the only female crew boat operator on the river. Mann had testified that she was with Balliviero until 10:30 p.m. on the night of April 19th. Balliviero argues that the introduction of this tape was important to bolster his credibility by showing that the meeting which Balliviero had with Mann was strictly a business affair. The government had attempted to impeach Mann's credibility by suggesting that the two were lovers. However, since the government proof shows that defendant arrived at the offloading site after midnight, his actions until 10:30 p.m. are irrelevant. The court below properly concluded that this tape was irrelevant and would only introduce extraneous matters that would confuse the jury.

Balliviero also asserts that the court below committed error by prohibiting him from calling the homicide detective who investigated the murder of Ralph Jackson. He sought to introduce photographs of the murder scene and the victim's body. The defendant contends that his testimony that Jackson was killed before repaying a substantial debt to Hindelang demonstrates that Hindelang had both the motive and opportunity to have Jackson killed. Hindelang's cooperation with the government, he contends, was an attempt to minimize the possibility that the government would investigate his involvement in the murder. The court ruled that the photographs were both irrelevant and prejudicial. That ruling was entirely proper. Balliviero was permitted to weave his theory about Hindelang's participation in the murder. The photographs not only fail to strengthen the inference that Hindelang murdered Jackson, but also are highly prejudicial.

Next, Balliviero argues that the trial court improperly denied access to the

2. The government suggests that the defense wished to demonstrate that Whitezell had also failed to mention a fourth load of marihuana. Whitezell never testified about this fourth load at trial, however, and therefore there is no inconsistency with a prior statement.

transcript of Hindelang's sentence reduction hearing. In that hearing, Hindelang allegedly implicated a number of other persons. Defendant asserts that he should have had a chance to review these names and verify the claim that they were involved in marihuana smuggling. What Balliviero is suggesting is that he should have had an opportunity to, in effect, try each individual against whom Hindelang cooperated so as to permit the jury to weigh credibility. The district judge committed no error in refusing to permit Balliviero to start on this ridiculous fishing expedition. Not only is this information irrelevant to defendant's case, but it would clearly have confused the jury and wrongly prejudiced the government's case.

In addition, Balliviero maintains that he should have been permitted to utilize the transcript to determine whether any additional promises were made to Hindelang. This would have permitted a stronger attack on his credibility, in defendant's estimation. The government points out that the material in the transcript concerned on-going investigations. If the court had permitted the use of this transcript, the prejudice to the government's on-going investigations unrelated to the Balliviero case would have been substantial. Furthermore, a day and one-half of cross-examination had permitted defendant to extensively challenge the credibility of this witness.

It appears that defendant misperceives the thrust of the doctrine established in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A defendant cannot simply allege the presence of favorable material and win reversal of his conviction. As this Circuit noted in *Ogle v. Estelle,* 641 F.2d 1122 (5th Cir.1981)

> The United States Supreme Court held in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), that suppression by the prosecutor of evidence favorable to an accused when the accused has specifically requested the evidence violates due process "where the evidence is material either to guilt or to punishment." The holdings of this Court establish that a defendant seeking to establish a *Brady* violation must prove the following: (1) the prosecution's suppression of evidence; (2) the favorable character of the suppressed evidence for the defense; and (3) the materiality of the suppressed evidence.

641 F.2d at 1124.

In the same vein, Balliviero challenges the court's refusal to permit him to view the pre-sentence investigation report made in connection with Hindelang's plea agreement. The basis for this argument is that the report is important for purposes of cross-examination and impeachment. The court denied this request, citing Rule 32(c) of the Federal Rules of Criminal Procedure, which requires that the strictest of confidentiality be afforded information provided by a defendant to a probation officer. Although defendant charges that the court failed to review the report for possible *Brady* material, the record clearly demonstrates that such a review was conducted. Record on Appeal, vol. 5, at 108–09. His refusal to permit defendant to view the report is tantamount to a statement that there was no *Brady* evidence in the report. The judge, therefore, committed no error when he made the challenged ruling.

Finally, Balliviero contends that the evidence is insufficient to support his conviction because the government failed to prove that he obtained "substantial income" from his part in the marihuana smuggling operation. This is untrue. The government introduced undisputed evidence that the drug operations in which Balliviero participated netted more than 350,000 pounds of marihuana, valued at $225.00 a pound. The government also elicited testimony that Balliviero's share of the profits from this operation was twenty percent. Viewing, as we must, the evidence in the light most favorable to the prosecution, we are called upon to judge whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560

944

(1979). Since circumstantial evidence may serve to prove the receipt of substantial income, *United States v. Phillips,* 664 F.2d 971, 1035 (5th Cir.1981), we must hold that the government did prove that Balliviero obtained substantial income from this smuggling venture.

For the above-stated reasons, the conviction of Lloyd Balliviero is affirmed.[3]

AFFIRMED.

---

**3.** Although we affirm defendant's conviction, we also grant defendant's motion to strike page 23 of the government's appellate brief. Defendant's comments about guilt made at the sentencing hearing are certainly not relevant to this appeal, which considers the fairness of his trial. We stress the impropriety of inclusion of these statements in the government's brief.