**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Harold GRUBBS and Sherman Fricks,**
**Defendants-Appellants.**

**No. 84–2324.**

United States Court of Appeals,
Fifth Circuit.

Nov. 22, 1985.

---

Fred Bennett, Dallas, Tex., for Grubbs.

C. Anthony Friloux, Andrew T. McKinney, III, Houston, Tex., for Fricks.

Daniel K. Hedges, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., Mervyn Hamburg, Atty., Appellate Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GARZA, JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Sherman Fricks and Harold Grubbs appeal their convictions of conspiracy to receive and solicit money with intent to influence actions and decisions relating to a labor union employee benefit plan, 18 U.S.C. § 361, and the related substantive count, 18 U.S.C. § 1954. Fricks and Grubbs assert several errors. Fricks contends the evidence is insufficient to sustain his convictions, and his indictment was fatally defective. Grubbs argues the trial court erred in dismissing a juror. Both defendants claim that their entrapment defense was established as a matter of law and that the government improperly used a suppressed conversation in various ways. We affirm the judgment of the district court.

## I. FACTS

Fricks and Grubbs were implicated by Operation Bri-lab.[1] The purpose of this undercover operation was to bring to justice labor union officials and public officials who were willing to accept bribes in exchange for using their influence to deliver insurance business. Grubbs was Director of Education for the Apprentice Committee associated with Local 211 of the Pipefitters Union in Houston, Texas. He was a close associate of Fricks who was the business manager for Local 211 and one of the eight trustees of the Local's health and welfare fund.

Local 211 was searching for a health and welfare insurance plan for its members. Joseph Hauser, a convicted felon, was the government agent who first contacted the defendants.[2] He purported to represent Prudential Insurance Company. Hauser met with Grubbs and Fricks on July 9,

---

1. The trial of Fricks and Grubbs was the third one that resulted from this undercover operation. *See, e.g., United States v. Garrett*, 716 F.2d 257 (5th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984).

2. Hauser was an insurance salesman who specialized in labor union health and welfare insurance and pension plans. Hauser had been convicted of bribing union officials to attain union insurance business. He acted for the government in Bri-lab while appeal from his conviction was pending before the Ninth Circuit Court of Appeals. Hauser had also been indicted on charges of violating Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961–1968. In exchange for his cooperation in the Bri-lab undercover operation and his pleading guilty to three counts, the government agreed to dismiss the remaining counts and to advise a sentencing court of his cooperation.

1979, to discuss awarding Prudential the health and welfare insurance contract. The conversation was recorded by a tape recorder concealed in Hauser's attache case.

Hauser first met with Grubbs alone. Grubbs told Hauser Prudential's proposition would have to appear legitimate, but he assured Hauser that Prudential's prospects were good. Grubbs said that Fricks "ran the health and welfare fund trustees" who awarded the contract but that Fricks would "go along" with Grubbs's recommendations. Hauser offered Grubbs a retainer of $2,000. Grubbs refused, stating he did not want money until Prudential secured the contract. Grubbs, however, did agree to accept a fifty percent share of all commissions Hauser would earn as Prudential's broker if the Local awarded the health and welfare insurance contract to Hauser. Grubbs thought this commission was "one of the best he had heard of." To clarify his pay-off, Grubbs asked, "What's the bottom line for me?" Hauser answered he could expect a minimum of $50,000 annually or $4,000 monthly in cash. Grubbs cautioned Hauser to not mention this money to Fricks, adding that he would handle everything. He explained that Fricks was "covered by law," whereas he was not.

Hauser then again offered Grubbs $2,000. Grubbs expressed reluctance to accept money for services that had not been rendered, but he accepted the money. Hauser then gave Grubbs two envelopes. He told Grubbs to keep the envelope containing $2,000 and to give the envelope containing $1,000 to Fricks. Hauser excused himself and went to the men's room, leaving behind the concealed recorder, still running. Fricks arrived and his conversation with Grubbs was taped.

Upon Hauser's return, the three went to lunch. When they returned to Grubbs's office, Hauser saw Grubbs give Fricks one of the two envelopes he had previously given Grubbs. Before Fricks left the meeting, he told Hauser that he would find out the other insurance company's bids and would disclose them to Hauser.

As promised, in early August Fricks called Hauser to discuss submitted bids. Prudential's bid was the second lowest. During a dinner with Hauser and other undercover F.B.I. agents on August 13, 1979, Grubbs was less optimistic about Prudential obtaining the contract. Jerry Lancaster, head of the union's consulting firm, was lobbying strenuously for Washington National, the firm with the lowest bid. Grubbs thought Lancaster had "cut a deal" with Washington National and bitterly noted that "he's offered us nothing." Again the following day, Grubbs was worried that Washington National would win the contract. Grubbs told Hauser that Prudential was a latecomer, and Lancaster "had already set this deal up for [Fricks]." Grubbs lamented that Fricks would "wind up with peanuts" if Washington National got the contract.

On August 30, 1979, Fricks met with Grubbs and Hauser. Fricks stated that he had decided to support Prudential, but the bid had to look "kosher." He proposed Prudential expand its coverage to make its higher bid look like the best offer. He added Washington National had offered him one-third of one-percent of the commissions. He said he had done research, and this would only yield a thousand dollars a month maximum. He asked Hauser how much Lancaster would make, and he was dismayed to learn that Lancaster would earn $100,000 over three years. Fricks was miffed that Lancaster had not told him about this deal with Washington National. Fricks noted he would be meeting Lancaster later that day, but he would not "tip his hand" to Lancaster. In fact, Fricks stated, the trustees' decision to award the contract to Prudential would come as a complete surprise to Lancaster; Fricks expected a trustee representing management to make the motion to approve Prudential.

On September 9, Hauser gave Grubbs two envelopes each containing $1,000 and told him to give one of the envelopes to Fricks. Later that evening, another

government agent, Wacks, asked Fricks if he had received his envelope. Fricks replied that he had and that he appreciated it. On September 26, 1979, the trustees of health and welfare fund awarded the insurance contract to Prudential. Hauser presented Grubbs and Fricks with their first monthly pay-off of $2,000 each on October 17, 1979. He complimented them on their efforts to secure the contract for Prudential despite the pressure to award the contract to Washington National. Fricks and Grubbs agreed that it had not been easy, but they had succeeded.

Grubbs and Fricks were summoned to testify about their involvement in operation Bri-lab before a federal grand jury in February of 1980. The grand jury indicted the two on May 26, 1981, and they were arrested the next day. The defendants' jury trial began November 1, 1983 and lasted over five months. The jury found both defendants guilty as charged. The defendants appeal.

## II. ENTRAPMENT

Both defendants claim that their defense of entrapment was established as a matter of law. Defendants argue that they carried their burden by presenting evidence of entrapment, and the government then presented no evidence of predisposition. We must determine if the evidence in the defendants' favor is "so overwhelming that it [is] patently clear or obvious that [they were] entrapped as a matter of law." *United States v. Lentz*, 624 F.2d 1280, 1287 (5th Cir.1980), *cert. denied*, 450 U.S. 995, 101 S.Ct. 1696, 68 L.Ed.2d 194 (1981); *quoting from United States v. Bower*, 575 F.2d 499, 504 (5th Cir.), *cert. denied*, 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (1978).

▆▆▆ After a full review of the record, we conclude that the government presented sufficient evidence of predisposition to send that issue to the jury. It is well established that entrapment is a jury question. *United States v. Lentz*, 624 F.2d at 1286. Predisposition may be proved by evidence of the defendants' "conduct and statements

subsequent to initial contact with the government agent, as well as proof of state of mind before the contact was made." *United States v. Garrett*, 716 F.2d 257, 274 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1910 (1984), *citing United States v. Dickens*, 524 F.2d 441, 445 (5th Cir.1975), *cert. denied*, 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976). Both Grubbs and Fricks expressed readiness to steer the insurance contract to Prudential, cautioning Hauser that Prudential's bid had to appear legitimate. Grubbs assured Hauser he could deliver the contract to Prudential because Fricks "ran the trustees" and Fricks would "go along" with Grubbs recommendations. Grubbs asked Hauser "what is the bottom line for me?," and Hauser told him he would split the commission fifty/fifty and Grubbs could expect $50,000 cash. Grubbs warned Hauser not to contact Fricks because he was "covered by law;" he would take care of Fricks.

A source of discontent for Grubbs and Fricks was the deal Jerry Lancaster, head of the union's consulting firm, apparently had made with Washington National, one of Prudential's competitors. Grubbs and Fricks were disgruntled because Lancaster would receive a lion's share of the profits, $100,000 over a three-year period. Grubbs complained that Lancaster had "offered us nothing." Fricks complained because Washington National had offered him one-third of one percent commission, and his research indicated that this would only amount to a paltry $1,000 a month maximum.

Grubbs makes much of the fact that he was initially reluctant to accept payment. This alone does not mandate a directed verdict, particularly in light of the fact that Grubbs did not refuse because those payments were illegal, but because the deal might not be successful.

It is apparent, therefore, that there is some evidence that Fricks and Grubbs were "criminals in search of a crime." *U.S. v. Anderton*, 679 F.2d 1199, 1201 (5th Cir.1982). The evidence of predisposition was sufficient to go to the jury. No con-

tention is made that the jury was incorrectly instructed, so we must uphold the jury's verdict of guilty.

### III. SUPPRESSED CONVERSATION

Several arguments of the defendants focus on a fifty second to three minute portion of a tape recording. During the July 9, 1979 meeting, Hauser left his brief case that was fitted with a recorder in Grubbs office while he went to the men's room. While he was gone, Grubbs and Fricks entered the office and engaged in a conversation with incriminating overtones that the hidden device recorded. The conversation included reference to $50,000 which they would receive if the deal went through. The trial court found the recorded conversation was non-consensual and suppressed it.

■ Grubbs argues the non-consensual recording which the court had earlier ordered suppressed should not have been used to impeach him. The suppressed portion of the tape was admitted into evidence for the limited purpose of impeaching the credibility of Grubbs. Grubbs does not dispute that unlawfully intercepted conversations may be used for impeachment purposes. *United States v. Caron,* 474 F.2d 506, 508 (5th Cir.1973). Instead, Grubbs makes two distinct arguments. First, Grubbs asserts that he did not "open the door" during direct examination to questions on cross-examination regarding the suppressed conversation. Second, Grubbs claims his own testimony was not false and thus could not properly be subjected to impeachment.

As to the first argument, Grubbs argues that the trial court erred in its application of *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). In *Havens,* the Supreme Court rejected a rule that illegally seized evidence may be used to impeach only defendant's direct testimony. The Court opted for a broader rule and held that "a defendant's statements made in response to proper cross-examination *reasonably suggested* by the defendant's direct examination are subject to oth-

erwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt." 446 U.S. at 627, 100 S.Ct. at 1917, 64 L.Ed.2d at 566 (emphasis added). As this Court stated in *United States v. Hernandez,* 646 F.2d 970, 977 (5th Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981), "the proper inquiry is whether the cross-examination which elicits the statements to be impeached by the illegally seized evidence is 'proper,' i.e., whether it is within the scope of direct evidence."

■ Grubbs testified on direct that he was a licensed insurance agent, and the services he performed for Hauser were in this legitimate capacity. He insisted he was legally entitled to the money received from Hauser. On cross-examination, Grubbs testified as follows:

Q. When Mr. Fricks arrived at your office on July 9, 1979, and Mr. Hauser was out of the room, did you have a conversation with Mr. Fricks?

A. Are you speaking about our first meeting that we had with Mr. Hauser?

Q. The very first one.

A. I don't recall.

Q. Did you tell him that there was $50,000 it in for us if we give this guy the bid package?

A. I testified before the Grand Jury I don't recall that.

Q. You testified before the Grand Jury that never happened, not that you didn't recall it; didn't you?

A. I testified before the Grand Jury that I didn't—that it never happened. But I don't recall it ever happening.

Grubbs contends that his statements did not warrant the questioning on cross-examination. We find this contention fails. Grubbs emphasized the legality of his business dealings with Hauser on direct. The government could properly question him

about the conversation covered by the recording which indicated Grubbs knew the deal was not legitimate. This line of questioning was "reasonably suggested" by Grubbs' direct examination.

In his second argument, Grubbs claims that he did not deny the existence of the conversation, only that he could not remember it.[3] In other words, a denial of recollection cannot be regarded as inconsistent. The federal courts are not in agreement as to whether lack of memory can be impeached. The Second and Eighth Circuits have held that the trial judge, in his discretion, determines "whether a claim of faulty memory is inconsistent with statements previously given." *United States v. Rogers,* 549 F.2d 490, 496 (8th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 228 (1977); *United States v. Insana,* 423 F.2d 1165, 1170 (2nd Cir.), *cert. denied,* 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970). These courts rely upon the reasoning of Dean Wigmore: "[an] unwilling witness often takes refuge in a failure to remember, and the astute lier is sometimes impregnable unless his flank can be exposed to an attack of this sort." 3A J. Wigmore, Evidence § 1043, 1061 (Chadbourn Rev.1970).

We have held, however, that a claim of faulty memory does not constitute an inconsistent statement. *United States v. Balliviero,* 708 F.2d 934, 940 (5th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 351, 78 L.Ed.2d 316 (1983). In *Balliviero,* the defense counsel asked the witness if he recalled making a certain statement. The witness said he did not. The defense counsel then asked the witness if he denied making the statement. The witness replied: "I don't deny it, but I don't remember making it." We stated: "Since there is no denial that the statement was made, there is clearly no rationale for the introduction of a prior 'inconsistent' statement about the incident." *Id.*

The instant case is distinguishable from *Balliviero.* Grubbs did more than say he did not remember the conversation. He admitted he had denied the existence of the conversation to the grand jury. This situation more closely resembles a flat denial than a claim of faulty memory, and we treat it as such. Thus, the trial court did not err in allowing Grubbs to be impeached by the suppressed conversation.

Even if it was error to impeach Grubbs with the suppressed conversation, this error was harmless beyond a reasonable doubt. "It is inappropriate to reverse a lower court conviction on account of errors which do not affect the substantial rights of the part[y] asserting that error. 28 U.S.C. § 2111; Fed.R.Crim.P. 52(a). To determine whether an error in a criminal case is harmless, we must examine whether there is a reasonable possibility that the [error] might have contributed to the conviction." *United States v. Lay,* 644 F.2d 1087, 1090 (5th Cir.), *cert. denied,* 454 U.S. 869, 102 S.Ct. 336, 70 L.Ed.2d 172 (1981). The tape was admitted only for impeachment purposes and the court carefully instructed the jury on this point. In addition to this portion of the tape, there was evidence beyond a reasonable doubt of Grubbs's guilt.

Next, Grubbs claims that all evidence obtained after the July 9th non-consensual recording was fruit of the non-consensual recording and should have been suppressed at trial. Grubbs's argument is without merit. The bulk of the evidence introduced against the defendants consisted of taped conversations between the defendants and government agents. None of the conversations between the defendants and government agents that occurred after the July 9th non-consensual recording were derived from the suppressed conversation. We agree with the district court's finding that no evidence was seized, either directly or indirectly, as a result of the illegal seizure of the non-consensual recording.

**3.** It is not clear from the record if Grubbs made this specific objection at trial, but in any event we find the trial court did not err in admitting the suppressed conversation for impeachment purposes.

Grubbs's contention that the case should be dismissed because of prosecutorial misconduct in obtaining evidence is also without merit. Grubbs claims the government's obtaining and using the non-consensual recording constitutes prosecutorial misconduct. This contention has no independent stature beyond the obtaining and use of the recording dealt with above, and we reject it.

■ Finally, Grubbs and Fricks contend that the prosecutor made certain remarks about the suppressed tape during his closing argument that constitute fundamental error. The prosecutor told the jury that the July 9th conversation between Grubbs and Fricks regarding $50,000 would not be included in the transcripts that would accompany them to the jury room because the conversation was non-consensual and thus had been suppressed. The prosecutor added it was able to introduce this conversation into evidence only because Grubbs and Fricks had lied on the stand.[4] The prosecutor referred to this suppressed conversation again in rebuttal during closing argument, but this time emphasized to the jury that the conversations could not be considered as substantive evidence.[5] Neither defendant made a timely objection to the government's closing argument. The next day the defendants moved for a mistrial. The trial court denied the motion.

In the absence of a timely objection at trial, this Court must determine if the error rises to the level of plain or fundamental error. Fed.R.Crim.P. 52(b); *United States v. Garber*, 471 F.2d 212, 217 (5th Cir.1972). We must evaluate the claim of plain error in the context of the entire record. *United States v. Young*, — U.S. —, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985). If we find the prosecutor's comments "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice," those comments constitute plain error. *Id.* 105 S.Ct. at 1047.

The prosecutor's remarks were improper. The prosecutor may only base his argument on the evidence. *United States v. Morris*, 568 F.2d 396, 401 (5th Cir.1978). The fact that the conversation was suppressed was not evidence, and he should not have mentioned it in his closing argu-

---

4. The prosecutor said:

And when you read these transcripts you are not going to see on that transcript that portion of the tape that we played you about Fricks and Grubbs getting together and talking about the $50,000 in cash for us. The reason you are not going to see it on the transcripts, you heard Mr. Fricks on the witness stand say, yes, I have heard that portion of the tape over and over with you at the other pretrial hearings. Yes. I have heard it. What happened was in the pretrial hearings that portion of the tape was suppressed because it is inadmissible evidence. It was done non-consensually, neither one of those people knew that they were being taped. That portion of the tape was suppressed as not admissible evidence. We would have never gotten it in, except Fricks and Grubbs get on the stand and lie about it. Evidently they thought and their lawyers thought they could just get up and lie about it since it is suppressed.

Well, once they start lying about it, of course, you can offer it to impeach them to show what the truth is. So, when they got up and said, no, what Fricks said, no, the first time I knew anything about any money was in October 17 when it was paid to me. Well, that is a clear lie. That is why we are able to play that portion of the tape that showed that right before Fricks beats [sic] Hauser, when Hauser has gone to the restroom, Fricks comes into this vacant office, Grubbs meets with him there, that brief case is sitting there, that recorder is running. Grubbs is so excited and whispering and says, briefly, briefly, here is what the deal is. This guy represents Prudential. There is $50,000 in cash for us if we give him the bid package. He is laying out a brief summary of what Fricks lied to you and lied to the Grand Jury, didn't know anything about any money until October 17th when it was passed to him. I think you saw the credibility of both of those defendants on the witness stand.

5. The prosecutor stated:

And incidently, speaking of that conversation, ladies and gentlemen, you cannot use that, as her honor as already told you. I want to reiterate to you, you cannot use that testimony for any purpose other than to determine did these people lie. Were they impeached by that? You cannot use that. You must block that out of your mind. I ask you to block that out of your mind when it comes to the decision of whether or not initially these people are guilty are not. You cannot use it for that purpose.

ment. His argument also exceeded the proper bounds by giving the jury the impression the tape was substantive evidence, not strictly limited to impeachment purposes. It was unlikely, however, "that the jury was lead astray." *Young,* 105 S.Ct. at 1045. The prosecutor later admonished the jury to not consider the conversation to determine guilt. It was sufficiently clear to the jury that this evidence was to be used only for impeachment. The prosecutor's comments did not have the requisite detrimental effect on the "jury's ability to judge the evidence fairly." *Young,* 105 S.Ct. at 1045. We hold that the prosecutor's argument did not rise to the level of plain error.

## IV. SUFFICIENCY OF EVIDENCE

■ Fricks contends that there is a lack of evidence to prove that he knew of, intended to join, and participated in the conspiracy. We review the evidence and the inferences which may be drawn therefrom in the light most favorable to the government, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and must judge that evidence as sufficient to support a conviction if "a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). We find the record supports the verdict of the jury that Fricks was part of the conspiracy. The jury was entitled to

infer that Fricks had the requisite knowledge, intent, and participation, particularly from the evidence of the three instances in which Fricks received payments to influence the trustees' decision about the health and welfare plan. Fricks received a $1,000 pay-off on July 9, 1979, a second $1,000 pay-off on September 9, 1979, and a $2,000 pay-off on October 17, 1979.

## V. FAULTY INDICTMENT

■ Fricks also contends that count two of the indictment, charging Fricks with receipt of a kickback, is fatally defective.[6] He argues he cannot be charged with accepting a kickback on October 17th since the evidence at trial established the objective of the bribery, Prudential's securing the bid, was achieved before this date. This argument is specious. Evidence offered at trial does not make an indictment defective, although a variance may arise when the evidence departs from the allegations in the indictment. W. LaFave & J. Israel, Criminal Procedure § 19.2 at 721 (1985).[7]

■ The indictment was valid. It was based on 18 U.S.C. § 1954[8] and tracked the language of the statute. It is well established that an indictment that sets out the offense in the language of the statute itself is valid so long as the indictment alleges all the necessary elements, as did the instant indictment. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Webb,* 747 F.2d 278, 284 (5th

---

6. Count two of the indictment charged:
   That on or about October 17, 1979, in the Southern District of Texas, and elsewhere, the defendants, Harold Grubbs and Sherman Fricks, unlawfully, willfully, and knowingly received, agreed to receive and solicited the sum of $2,000 each as a fee, kickback, commission, loan, gift, money and a thing of value from Joseph Hauser because of and with intent to be influenced with respect to the defendants actions, decisions and other duties relating to questions and matters concerning the health and welfare plans of Local 211 of the Pipefitters Union in Houston, Texas, to wit: to assure the securing of the said health and welfare plan of Local 211 Pipefitters Union by Prudential Insurance Company.

7. Fricks does not allege a variance, nor does it appear he could do so successfully since the government's proof did not vary from the charges in the indictment.

8. This statute punishes any trustee of an employee welfare benefit plan who "receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan...." 18 U.S.C.A. § 1954 (West 1984).

Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1222 (1985); *United States v. Williams,* 679 F.2d 504, 508 (5th Cir.1982), *cert. denied,* 459 U.S. 1111, 103 S.Ct. 742, 74 L.Ed.2d 963 (1983). The indictment fulfilled its role of providing Fricks with fair notice of the charges against him and protecting him from a risk of double jeopardy. *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935), *United States v. Montemayor,* 703 F.2d 109, 117 (5th Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

### VI. DISMISSING A JUROR

Grubbs contends that the trial court committed error by excusing a seated juror without prior notification and consultation with defense counsel. Before the government's opening argument, the trial court advised the parties that it had dismissed a juror. The court stated:

> Wait a minute. Now we have another problem. I forgot to tell you about. Ruth Poncik, who is a juror.... She is under the care of a physician. She is juror number twelve, according to my notes, .... She is under the care of a physician, is receiving necessary drugs which make her drowsy and she cannot drive. And I have excused her this morning. Therefore—and I understand —Mr. Waska (counsel for Fricks) if you want to you can make an objection. I have a case to cite to you about that, but make your objection if you wish. But she has been excused. Therefore, Marie Herbert, who is alternate number one, the first alternate, will be substituted as a member of the twelve-person jury.

Grubbs did enter an objection to the juror's dismissal. Grubbs claims the dismissal of Mrs. Ponick in his absence violated his right to trial by jury under the Sixth Amendment and Fed.R.Crim.P. 43(a).[9]

■ This case is similar to *United States v. Dumas,* 658 F.2d 411 (5th Cir.

1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982). In *Dumas,* after the jury had been selected, the district court released a juror and replaced him without notifying the parties. The court excused the juror in response to the request of the juror's employer. The employer said the juror was urgently needed to perform a fuel inspection at a United States Air Force base in California. The court stated:

> We do not feel that the trial judge's determination of the juror's inability to serve, even though that determination was unwisely made outside the presence of defense counsel, merits the reversal of the conviction. The record reveals that Dumas' objection at trial to the excusal was not based on the denial of notice or presence at the conference. Consequently, the District Court did not give reasons for the non-notification or for the failure to have the defendant present at the conference. Even if this issue is properly before this Court, the record indicates that it was by inadvertence, not design, that Dumas was not notified or present at the conference when the excusal was granted, and the error was harmless beyond a reasonable doubt.

As in Dumas, Grubbs's objection at trial was not based on the denial of notice or denial of presence at the conference. Grubbs made a general objection. In any event, any error the trial court may have committed was harmless error beyond a reasonable doubt since the failure to have Grubbs present was inadvertent. *Dumas,* 658 F.2d at 414; *United States v. Dominguez,* 615 F.2d 1093, 1096 (5th Cir.1980).

A thorough review of the record and all contentions of appellants reveals no reversible error. The convictions of Grubbs and Fricks are properly affirmed.

AFFIRMED.

---

9. Fed.R.Crim.P. 43(a) provides:
   The defendant shall be present at the arraignment, at the time of the plea, at every step of the trial including the paneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.