SULLIVAN *v.* STATE.

Division B. Jan. 7, 1952.

No. 38178 (56 So. (2d) 93)

R. C. Russell, G. B. Grubbs, B. C. Little, L. D. Pittman, and A. W. McRaney, for appellant.

Joe T. Patterson, Assistant Attorney General, for appellee.

### Roberds, P. J.

Sullivan was convicted of manslaughter in causing the death of Roberta Knox by his culpable negligence. Section 2232, Miss. Code 1942.

He requested, but was refused, a peremptory instruction. He says he was entitled to that instruction, but, if not, that the verdict is against the great weight of the evidence and that we should remand the case for trial before another jury. We will consider the two contentions together. They call for a brief review of the pertinent parts of the testimony bearing upon the guilt or innocence of the defendant and the credibility of the witnesses.

It is admitted that the death of Roberta Knox was the result of an automobile collision which occurred around 2:30 to 3 o'clock on Saturday afternoon July 2, 1949, on U. S. Highway 49 about half a mile south of Magee, Mississippi, between a Chevrolet truck being driven north by defendant and a GMC truck going south, and that the GMC truck turned over and finally rested on the west side of the road, pinning Roberta Knox thereunder, horribly mangling her body, and that she died shortly thereafter at a hospital in Magee.

The State used seven witnesses. Rosa Jenkins testified that she was riding on the back of the GMC truck; that it had a cab and a flat body; that there were seven Negroes and the white driver on that truck; that the

Negroes had been picking cotton near Shaw, Mississippi, and were being driven to their homes in, or near, Hatties-burg, Mississippi. She said that when the truck on which she was riding reached the crest of a hill and began to descend going south, she saw two cars approaching from the south, that of defendant being behind the other; that defendant "* * * pulled around to his left to try to pass that car, I reckon he thought he could pass, but he didn't, and come on and hit us." Again, she said "* * * and the truck pulled around that car; or tried to pass it, and couldn't and struck us". On cross examination she said, "I saw two cars coming, and this other car tried to pull around the other car, the truck did, it was a truck, I reckon he thought he could pass the car, but he couldn't make it by. So he sideswiped us * * *"; that the GMC driver pulled to the right, got a wheel off the pavement but could not avoid the wreck; the GMC truck turned over and finally rested on the west side of the road, pinning the body of Roberta Knox under it. The GMC truck was not traveling fast.

Estus Nichols knows Sullivan; he was about 300 yards from the accident. He did not see but did hear the collision and immediately went to the scene. He heard the GMC truck when it turned over. He said he found a lot of colored people "all bunged and bruised up and crippled". He assisted in removing Roberta Knox from under the truck and helped carry her and others to the hospital at Magee.

Eddie Earl Knox is a daughter of Roberta Knox. She was riding on the flat part of the body of the GMC truck behind the cab. The white driver and two Negro women were on the seat inside the cab. The other five were on the back of the GMC truck. She said "* * * I saw a car coming up the hill, and he was on our side of the road, and when he hit our truck it turned over". Again, "I saw him when he tried to get back in, but he couldn't, and that is when he hit us".

Nolan Welborn was in a car going south behind the GMC truck. He saw the accident. He was about 100 yards away. He was fixing to cross the highway to the east and had slowed almost to a stop waiting for northbound cars to pass so he could safely get across. He said, "Barney (Sullivan, the defendant) was coming on his side of the road, and there was a car ahead of him, and he tried to get around their car, and crossed over the line, and did not have time to get around that car, and tried to get back in on his side, but did not have time before this truck got there, and they met up there"; that defendant was across the yellow warning line. "He was about half way over the line trying to get back on his side of the road". Sullivan did not stop. As he passed Welborn he called out, "Where in the hell are you going?", and directed some name or epithet to Welborn, but Welborn, when asked what it was, replied "I don't want to say that here—just what he called me." On cross examination he said Sullivan's truck was about half over the yellow line and that his left front fender hit the GMC truck; that this truck "slid part of the way before it started turning over". He went to the scene and then accompanied Hopkins, the patrolman, to find Sullivan.

Bill Lucas testified that Sullivan came to his home that day about noon. Sullivan was then drinking. Witness went with Sullivan in the Chevrolet truck to Mt. Olive. Sullivan had a pint bottle of whiskey; drank all, or a part, of it.

They then went to Mendenhall. Sullivan bought a half pint of whiskey at Bruce's place. Sullivan drank that. They went to the Farm Implement Place; then came back to Bruce's, where Sullivan bought another half pint of whiskey. Bruce's place was about a half mile south of the place of the wreck. After leaving Bruce's they drove around some and finally headed north on Highway 49. They met George Sasser and Frank Porter. While talking Sasser said his car would run faster than Sullivan's,

but Sullivan said "it would not". Sasser started north on highway 49, Sullivan following him, but Sullivan passed Sasser. "We were going pretty fast, there was a car in the road ahead of us, and he started to go around this car, and he got out to his left over the yellow line and this other truck that had the Negroes on it was coming over the top of the hill, and he started to get back on his side, get back in line, and he did get about half way over the line and they struck". They had traveled about 150 feet up the yellow line when Sullivan crossed over. Sullivan kept going. Witness, through the rear-view window, saw the GMC truck turn over, and told Sullivan he should stop but Sullivan said "I just scraped it". On cross examination he said the GMC truck, after being hit, "was wobbling back and forth down the highway". Again he said Sullivan was "* * * over on the truck side of the highway". The Sullivan truck was going up a hill. He and Sullivan then went to the home of George Sasser, brother-in-law of accused. Sullivan's drunken condition when Hopkins came to arrest him was about the same as when the wreck occurred. On cross examination he admitted that he had given a written statement to the effect he was asleep and did not see the wreck, but he said that was not the truth; that he had made the statement because "Barney Sullivan said if I knew what was good for me I had better say that I was asleep". He said he was afraid of Sullivan; also that Van Sullivan, brother of appellant, had also threatened him. He then said his testimony as given on the stand was the truth. He admitted he had been convicted "for running up behind a car and stopping too quick."

A. L. Hopkins was a highway patrolman from Mendenhall to Hattiesburg. He got news of this wreck over his radio near three o'clock. He was eight miles away. He immediately went to the scene. He examined the physical conditions there. Various parts of the bodies of the two trucks had been broken and torn off and were scat-

tered on the ground. These, or some of them, he gathered up and they were introduced in evidence. The wreck occurred west of the yellow line. The road was practically straight north and south. The north bound truck was traveling up the hill. The GMC truck had overturned into a ditch to the west of the road. It was about 300 feet south of where the impact occurred. The accident occurred 150 feet north of the south end of the yellow line. Learning that Sullivan was in the wreck he began to search for him and found him at Sasser's. Sullivan was drunk. He arrested and placed him in jail. Witness had pictures made of both trucks.

Dr. V. L. Sansin was connected with the Magee Hospital. Roberta Knox was brought to the hospital about 3 o'clock. She had "multiple contusions all over the body, and both legs broken, and one almost severed in two * * *". She died in about thirty minutes.

Here the State rested.

The first witness for the defense was Van Sullivan, a brother of accused. He and his wife were driving north on this road about the time of the accident. He saw the GMC truck coming down the hill and "all at once it went to wobbling and run off the pavement and turned over". That was some 250 yards south of the top of the hill. He drove two to three hundred yards up the hill, stopped and came back to the wreck. Pressed on cross examination he admitted he did not see the wreck. He was asked, "You are telling the jury that Barney did not hit the truck, are you? A. No, sir. Q. And you don't mean to intimate that? A. I didn't tell them that". He said there were a number of people at the scene when he got to it. Asked to name some of them he said, "Seems to me like I saw Clifton Kennedy there for one". Said he saw Lucas that day about twelve o'clock and Lucas was drunk. The wife of the witness did not testify.

Clifton Kennedy lived some 700 yards north of the place of the accident. He did not see it. He heard the

impact. He went to the scene; helped carry the injured to the hosiptal. Objection was sustained to his estimating the speed of the GMC truck just after it passed his house. Further reference will be made to this testimony as bearing upon another point raised by defendant.

Randolph Hughes lived south of Magee. He operates a repair shop. He saw the GMC truck pass his house and he followed some 50 yards behind it "and pulled over the hill and I saw it turn over". He did not see the sideswipe. Asked if he saw the truck going north he replied, "I cannot say that I did". He went to the scene. Number of people there. He said the white driver made a statement to him. Court held he could say whether such a statement was made but not what was said.

Ernest Layton was standing about 50 yards from the road near the top of the hill. He heard, but did not see, the collision. "I don't know what happened before it turned over." He went to the scene. The GMC truck was turned over and headed back north. Accident happened just after the "big truck topped the hill". He saw Kennedy and Van Sullivan at the wreck; don't recall the others he saw. He said the "brush" between the trucks was on the east side of the center and he saw no car traveling north ahead of the defendant. He had been at court two or three days and was staying at the home of Van Sullivan.

Rosa Jenkins was recalled and testified she did not tell Della Heidelberg, "She grabbed the steering wheel and pulled it on her side."

Della Heidelberg was in the front seat of the cab with the driver and Rosa Jenkins. Witness was in the middle asleep and knew nothing of the cause of the wreck. Rosa Jenkins told her on Tuesday after the wreck on Saturday that she, Rosa, caught hold of the steering wheel after the impact. "She said she was trying to keep it from turning over on her side." Mr. Cecil, the driver told the witness Rosa did not catch hold of the steering wheel.

Tom Taylor, Marshal of Magee, at the request of defendant's father, made some measurements. From the point of impact to where the GMC truck turned over was 210 or 207 steps. The impact was near the top of the hill. The yellow line extended some 150 feet south of the place of impact. That yellow line was on the east side of the center of the road and means "Not to cross it". If so, there is danger to those coming from the opposite direction. The yellow line extended on up the hill. Some one pointed out to him the place of the wreck, which "seemed to be close to the yellow line".

Kennon Sasser, son of George Sasser, nephew of defendant, saw accused at his father's home about three o'clock the day of the wreck. Lucas was with him. Both there when Hopkins came. Lucas and accused came in the truck of defendant.

James Smith married a niece of defendant. Lucas and appellant came to his father's home in appellant's truck the day of the wreck. He did not remember the time. Asked if appellant was drunk he replied, "I would not say, but he did not appear to be drunk at the time." Asked if Lucas was drinking he replied, "I would not say about that either."

Here defendant rested and the case was submitted to the jury. The defendant did not testify.

We have endeavored to set out the substance of the testimony because of the earnest insistence of appellant that he should be discharged or the case remanded for another trial. However, it is clear to us that the evidence amply supported the finding by the jury, as from its verdict we must presume it found, that this accident occurred upon one of the main public highways of the state; that appellant was driving an automobile when in an intoxicated condition; that the road was straight and he was traveling up-hill; that he crossed the center yellow line which was a warning to him not to do so, and tried to pass another car near the top of the hill, when he could not see a vehicle approaching beyond the top of the hill

and when one might appear at any time; that the collision occurred when he was at least half way over this line, and that he evidenced his disregard of consequences by violating the law in not stopping at the scene of the accident.

We have laid down the rule by which to test guilt in these cases. "In order then to give the term culpable negligence in the statute its proper setting instead of harking back to gross negligence, the term culpable negligence should be construed to mean a negligence of a higher degree than that which in civil cases is held to be gross negligence, and must be a negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life, and that this shall be so clearly evidenced as to place it beyond every reasonable doubt." Smith v. State, 197 Miss. 802, 20 So. (2d) 701, 706, 161 A. L. R. 1; Downs v. State, 206 Miss. 831, 41 So. (2d) 19.

The facts, implicit in the verdict, which facts the jury had the right to find beyond a reasonable doubt, showed, on the part of appellant, a wanton disregard and indifference to the safety of human life, and bring his actions and conduct within the quoted definition of culpable negligence.

But appellant says, in this connection, that the testimony given by Billy Lucas was unbelievable; that he had given a written statement he was asleep when the accident occurred, and no weight should be attached to what he said as a witness on the stand. Lucas admitted he had given such a statement but gave as a reason therefor that he had been threatened by appellant and his brother. The substance of this statement, the explanation and the testimony given as a witness on the stand were all before the jurors and it was their province to determine the worth and weight of such testimony in the light of all the facts. Delta Chevrolet Co. v. Waid, 211 Miss. 256, 51 So. (2d) 443. In addition, the State did not rely upon the testimony of Lucas alone. The other

testimony, aside from that of Lucas, was ample to sustain the verdict.

Appellant argues with much seriousness that he is not guilty because when he saw the GMC truck approaching he made an earnest effort to get back onto his side of the road. Self-preservation is said to be the first law of nature. Whether this was the sole reason, or one of the reasons, for this effort is immaterial. ██ ██ He had deliberately and wilfully created the condition of peril. His effort to avoid the accident could not relieve him of responsibility under the circumstances.

Defendant moved to set aside the verdict on the ground of newly discovered evidence. The court overruled the motion. This, appellant contends, was reversible error.

Proof was taken on the motion. Arthur Mangum testified he talked with Lucas after adjournment of court; that Lucas said, "I am the man that convicted him"; that Lucas said if he had testified on the stand to the facts contained in his written statement, the jury would have acquitted defendant, but that Welborn told him, Lucas, in the witness room that if he did that the jury would convict him instead of Sullivan.

Jim Ainsworth testified that he heard Lucas tell Arthur Mangum that Welborn told Lucas he had "better leave that off", referring to the written statement Lucas had made, and that Welborn also said "they are fixing to prove you are the one driving the truck."

A. L. Mangum, son of Arthur, gave, in substance, the same testimony as that given by Ainsworth.

J. D. Austin testified that Welborn said he told Lucas that if Lucas testified to his written statement "they would pin it on him".

That was the evidence in support of the motion.

Lucas testified he told Arthur Mangum he did not know anything about the case and did not want to talk about it; that he never said to Mangum he was the man who convicted Sullivan. He denied that Welborn warned him he had better change his testimony from the written

statement. He then said what he had testified to as a witness on the stand was the truth.

 It was not error for the court to overrule this motion. Lucas, upon the trial, had explained why his testimony as a witness differed from the written statement. It was the province of the trial judge on this motion to appraise the truthfulness and the weight of these statements and the explanation of Lucas. And, further, as above stated, the State was not relying solely upon the testimony of Lucas. The other evidence was entirely sufficient to support the verdict of the jury.

 Pictures of the two trucks, made after the wreck, were admitted in evidence. Appellant complains of that. They were not made at the scene of the accident. However, they were made shortly thereafter and the trucks were then in the same condition as immediately after the collision. Due proof was made of the accuracy of the pictures. They are before us. They portray better than oral proof the nature and physical appearance of the damage to the vehicles and how they collided. They are very instructive. They were competent evidence. Le Barron v. State, 107 Miss. 663, 65 So. 648; Delta Chevrolet Co. v. Waid, 211 Miss. 256, 51 So. (2d) 443; Powell v. State, 195 Miss. 161, 13 So. (2d) 622; Wallace v. State, 203 Miss. 504, 35 So. (2d) 703; Sims v. State, 209 Miss. 545, 47 So. (2d) 849; Hancock v. State, 209 Miss. 523, 47 So. (2d) 833; Orr v. Columbus & Greenville Ry. Co., 210 Miss. 63, 48 So. (2d) 630.

 Clifton Kennedy, who lived some 700 yards north of the scene of the accident, was asked the speed of the GMC truck when it passed his house. Objection was sustained as to that. This is urged as error. The contention is not well taken, first, because the witness at one place said he did not see the truck when it passed his house; second, because he did testify to the speed of the GMC truck as it approached the top of the hill, and third, because the question here is the guilt or innocence of the defendant.

Kennedy got to the scene shortly after the wreck. He undertook to quote a statement he said was then made by the driver of the GMC truck, whom the Negroes called "Mr. Cecil", to the effect his truck turned over because it had been sideswiped, and when witness asked him why he got so far off to the right, that Cecil replied "The Negro woman took the steering wheel away from him". Exclusion of this testimony was not error—certainly not reversible error. Cecil's statement, if he made it, was pure hearsay. He was not a party to the suit. The statement was not against interest. He was not a witness. The statement did not contradict him. The testimony, if true, in no way lessened the negligence of appellant. And in addition to that Della Heidelberg testified, without objection, that Rosa Jenkins told her after the wreck that she, Rosa, caught hold of the steering wheel "to keep it from turning over on her side". Defendant got the benefit of this testimony.

The driver of the GMC truck was not introduced as a witness by either side. Appellant says it was reversible error for the State not to introduce him. The record does not disclose why he was not produced, or used, as a witness—whether at the time of the trial he was living, or dead, and, if living, whether he was within the jurisdiction of the court and available as a witness. In any event, the contention is not well taken. A number of eyewitnesses were introduced and the State, under the circumstances here, was not required to introduce this witness. Hale v. State, 72 Miss. 140, 16 So. 387; Ross v. State, 185 Miss. 438, 188 So. 295. The defendant could have used him if desired. The indictment was returned in September, 1949, and the case was tried in March, 1951. Defendant had all of that time within which to subpoena and produce the witness at the trial if he was available.

Appellant says the trial judge embarrassed one of the attorneys in the presence of the jury and that was error. That came about in this manner: In cross-

examining Ernest Layton, a witness for the defendant, the district attorney, with the evident purpose of showing the interest of the witness in the case and his relation to the defendant, asked him "Where did you spend the night last night?" Witness said he spent the night at the home of Van Sullivan, a brother of the defendant. Mr. Grubbs, one of counsel, for defendant, then asked the witness what he had for breakfast that morning. He replied, "We had a regular breakfast. Q. Did you enjoy it? A. Yes, sir." The trial judge then remarked, "Mr. Grubbs, if you are asking questions like that as insinuations at this court, you may stop it right where you have it. If you want to ask some competent questions the court will permit you to do so." We cannot say this was error. Certainly the questions were entirely immaterial and the trial judge, having the entire scene in view, was certainly in much better position than is this court to determine the purpose and effect of this type of examination. In addition to that, no objection was made at the time to the remarks and the judge was not asked to retract, alter or modify the statement.

The trial court granted the state the following instruction:

"The court instructs the jury for the state, that culpable negligence is defined to be negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life.

"The court further instructs the jury that while it is true that criminality cannot be predicated upon mere negligence or carelessness, yet it may be predicated upon that degree of negligence or carelessness which is denominated as culpable, and which constitutes such a departure from what would be the conduct of an ordinarily careful and prudent man under the same circumstances as to prove a wanton disregard of, or utter indifference to, the safety of human life; and if the jury believe from the evidence in this case beyond a reasonable doubt that the defendant voluntarily and negligently became so in-

toxicated by liquor that his mental and physical condition was so impaired and became so abnormal that he was unable to properly and safely drive and operate the automobile in which he was riding and driving at the time and that he operated the said automobile wantonly and in a manner to show a disregard of the safety of human life while in such condition in attempting to pass an automobile traveling in the same direction and going up a grade where there was the yellow danger line and thereby placing his vehicle in the left hand or western traffic lane and thereby collided with the automobile in which Roberta Knox was a passenger causing said vehicle in which Roberta Knox was riding to overturn and to kill her, the said Roberta Knox; and that if you further believe from the evidence beyond a reasonable doubt that the said actions of the defendant amounted to culpable negligence as defined in this instruction, and that as a direct result thereof the defendant Barney Sullivan struck the vehicle in which Roberta Knox was a passenger, and thereby injured and killed the deceased Roberta Knox, then the defendant Barney Sullivan is guilty as charged in the indictment and the jury should find so.''

Appellant imposes only two objections to that instruction: First, he says it omits the requirement that the jury must believe him guilty ''to the exclusion of every other reasonable hypothesis''. That requirement is applicable only to cases based entirely upon circumstantial evidence. Bivins v. State, Miss., 2 So. (2d) 805. This case is grounded in the main upon the testimony of eye witnesses.

The second objection urged to that instruction is ''* * * it pointed out and emphasized all of the state's testimony * * *''. Appellant misconstrues the instruction. After defining culpable negligence it specifically conditioned conviction upon the jury's finding certain facts ''from the evidence in this case''. That includes consideration by the jury of all of the evidence in the case.

The trial court granted the State this instruction: ·

"The court instructs the jury for the state that if you believe from the evidence in this case beyond a reasonable doubt, that the Defendant Barney Sullivan, did unlawfully and feloniously kill and slay Roberta Knox, a human being, in manner and form as charged in the indictment, then you should return a verdict of guilty as charged."

The attack upon this instruction, as we understand it, is that it fails to go into all of the details and essentials of manslaughter through culpable negligence. The instruction must be read in connection with all other instructions given in the case. It could not be misleading when considered along with the first above quoted instruction, for instance. In addition, the entire case was tried upon the theory of culpable negligence, and the instructions of defendant ground conviction upon the necessity that the State prove beyond a reasonable doubt all of the essentials of culpable negligence.

Defendant requested, but was refused, an instruction telling the jury "* * * that if you believe from the testimony that at and before ,the impact of the two trucks, that the defendant was making a reasonable and honest effort to avoid a collision", and that the driver of the other truck saw, or should have seen, the position of peril created by defendant, yet made no effort to avoid the collision when he could have done so, the jury should acquit defendant. The effort of defendant to avoid the collision after he had wilfully and deliberately created the condition of peril could not relieve him of the responsibility. That phase of the instruction is error and entirely misleading. The court correctly. refused it.

Affirmed.