534 So.2d 175 (1988)
Willie D. HARRISON
v.
STATE of Mississippi.
No. 57898.
Supreme Court of Mississippi.
November 9, 1988.
*176 G. Jyles Eaves, Eaves & Eaves, Richard P. Ballard, McNeel & Ballard, Louisville, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and SULLIVAN and ANDERSON, JJ.
SULLIVAN, Justice, for the court:
Willie D. Harrison and his wife were estranged, and Annie had been staying with Willie D.'s brother, Robert, and Robert's wife, in Louisville. On October 13, 1985, Harrison went to Ray Patty's house because Harrison thought Patty had been seeing Annie Ruth. After convincing Harrison that he was not seeing Annie Ruth, Patty agreed to go with Harrison to Louisville to talk with Annie Ruth.
Some two weeks prior to this occasion Annie Ruth had told Harrison that she was seeing Dennis Herrington and Harrison had confronted Herrington about this.
When Harrison and Patty got to Robert Harrison's home, they found Herrington's car already there. Patty went into the house. Harrison got a knife and went to the Herrington car where he found Annie Ruth with her head in Herrington's lap.
Harrison grabbed Annie Ruth by the hair of the head, pulled her from the car and stabbed her six times. He then scuffled briefly with Herrington. Meanwhile, Patty heard a scream and came out of the Robert Harrison house but saw nothing. Harrison told his brother, Robert, to call the police, then he and Patty drove to Noxapater to the home of Harrison's sister. Harrison told his sister to call the police, and shortly *177 thereafter he was taken into custody by the Winston County Sheriff's Office. Some time during the early morning he gave a statement regarding the killing of his wife.
On July 25, 1986, a Winston County Jury found Willie Harrison guilty of murder, and he was sentenced to life imprisonment.
Harrison appeals to this Court, assigning five errors:
I. The Court erred in allowing the District Attorney to impeach State witness, Ray Lee Patty, and allowing the State to "cross-examine" said State witness, and further for allowing said witness to testify that he was smaller than the Defendant and was "afraid of him" thereby highly prejudicing the jury, and further by overruling a motion for a mistrial;
II. The Court erred in allowing the State to call police officer Willie Joe Coleman for the purposes of impeaching their own witness, Ray Lee Patty;
III. It was error to introduce an alleged written confession of Appellant as the proof showed that Defendant could neither read nor write and did not understand the contents of the written statement taken by police officers immediately after his arrest;
IV. The State's proof was insufficient for a conviction of murder, especially since the State failed to call the only eye witness, "Moon" Herrington, as a witness, and the Court should have instructed the jury that they could find the Defendant guilty of no greater crime than manslaughter; and
V. The Court erred in refusing to grant a mistrial when one of the jurors left the Jury room during deliberations and came into the Judge's chamber and requested to be relieved from the Jury.

I.

THE COURT ERRED IN ALLOWING THE DISTRICT ATTORNEY TO IMPEACH STATE WITNESS, RAY LEE PATTY, AND ALLOWING THE STATE TO "CROSS-EXAMINE" SAID STATE WITNESS, AND FURTHER FOR ALLOWING SAID WITNESS TO TESTIFY THAT HE WAS SMALLER THAN THE DEFENDANT AND WAS "AFRAID OF HIM" THEREBY HIGHLY PREJUDICING THE JURY, AND FURTHER BY OVER-RULING A MOTION FOR A MISTRIAL.
Harrison's first assignment of error is predicated upon a series of exchanges between Assistant District Attorney Lacy and the witness Ray Lee Patty.
Q. Do you recall making a statement to Officer Willie Joe Coleman on the 14th of October, 1985?
BY MR. EAVES:
We object, Your Honor. This is his witness. He can't impeach his own witness.
BY MR. LACY:
Your Honor, I'm entitled to impeach my own witness on a lapse of memory if it becomes necessary. That's clear under the rules.
BY THE COURT:
Under the new rules, I think you're right.
BY MR. LACY:
Q. Now, do you recall talking to Officer Coleman on the 14th, which is the day after the 13th, the day Annie Ruth was killed, do you recall talking to him?
A. Well, like I said, my memory is  yes, I remember talking to him.
BY MR. LACY:
Q. All right. Do you remember telling the officer, "He was going to his sister's townhouse. On the way he kept telling me he had messed them up." Do you remember making that statement?
A. No, I don't. I don't remember telling anyone that.
Q. In the statement that you gave you do not remember making that statement at that time?
A. No. I said,  no  do you mind repeating that again?
Q. "He was going to his sister's townhouse. On the way he kept telling me he had messed them up." Isn't that the statement that you made to Officer Coleman when you were interviewed?

*178 A. No, I never told him he kept saying he messed them up. I never gave him that statement.
* * * * * *
Q. When you gave the statement to the officer on the 14th of October, did you testify you remembered giving  did you tell the officer, "He showed me a Dutch knife with blood on it"?
A. Like, I told you, I can't remember giving him that statement there.
* * * * * *
Q. Do you remember making the statement to the officer when you gave the statement on the 14th of October, 1985, "He continued to do it and say, `This is what I did with it' as he slung it back and forth." Do you remember making that statement?
A. No, I don't. I don't recall giving that statement.
* * * * * *
Q. When you gave your statement to Officer Coleman on the 14th of October, didn't you tell the officer, "I looked back when I heard Annie Ruth Harrison hollering." Didn't you tell the officer that?
A. I didn't say who I heard hollering. I said I heard a scream, and I said I was on the inside and I looked around but I was going down the hall.
Q. And didn't you say, "But I did not see Annie Ruth."
A. That's true. I did not see her.
Q. But you told the officer, "I heard Annie Ruth hollering." Isn't that what you told him?
A. Now, you're putting words in my mouth. Now, I said I heard her scream. I didn't mention no name.
* * * * * *
Q. And you have testified, I believe, that the Defendant told his brother and his wife to call the cops, that he'd caught them red-handed and that he'd messed them up. Isn't that what you just 
BY MR. EAVES:
Your Honor, I object to leading.
BY THE COURT:
Ask him if he made that statement.
BY MR. LACY:
Q. Did you make that statement?
A. I didn't say he had messed them up  do you mind repeating that question?
Q. Didn't you make the statement that the Defendant told his brother and his wife to call the cops, "I've caught them red-handed, I have messed them up." Isn't that what you told the officer? Isn't that what you've testified to?
A. All except messed them up. I can't remember  I can't recall saying messed them up. He said he caught them.
The defendant characterizes these exchanges as improper impeachment because the witness was not declared hostile, and a proper predicate was not laid.
First, this case was tried after the adoption of the Mississippi Rules of Evidence. Under 607, "the credibility of a witness may be attacked by any party, including the party calling him." The voucher rule, upon which the defendant mistakenly relies, has been repudiated. See, Comment M.R.E. 607. Second, it is clear that a proper predicate for impeachment was laid. See Carlisle v. State, 348 So.2d 765, 766 (Miss. 1977). Third, prior inconsistent statements may be used to impeach a witness even though the statements tend directly to inculpate the defendant. U.S. v. Hogan, 763 F.2d 697, 702 (5th Cir.1985). Fourth, Patty's testimony at trial reveals the necessary inconsistency. West, Handbook on Federal Evidence, Section 613.2 (2nd Ed. 1986).
However, a prosecutor may not use prior statements of a witness "under the guise of impeachment for the primary purpose of placing before the jury substantive evidence which is not otherwise admissible." U.S. v. Livingston, 816 F.2d 184, 192 (5th Cir.1987); U.S. v. Miller, 664 F.2d 94, 97 (5th Cir.1981), cert. denied 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982); (emphasis in original). Such a scheme serves as a device to avoid the hearsay rule. Hogan, 763 F.2d at 702. However, in this case it is not argued, and it is not plain from the record, that the prosecutor was *179 invoking the permission of Rule 607 merely as a subterfuge to place incriminating hearsay before the jury. See Miss.S.Ct.R. 6(b); M.R.E. 103(d).
The prior statements of Ray Patty were offered, not to prove the truth of the matter asserted, but as circumstantial evidence from which the jury could infer that the trial testimony of Ray Patty was unreliable. Therefore, they were not hearsay.
It would have been proper for the court sua sponte to instruct the jury to consider these prior statements as impeachment evidence only, but the failure to do so is harmless error. Miss.S.Ct.R. 11.[1] First, the jury's ability to obey such an instruction is questionable. Second, there was ample evidence, notwithstanding the prior statements, from which the jury could find the defendant guilty of murder. Third, the prior statements were disclosed in open court to Ray Patty and counsel opposite. M.R.E. 613(a). Fourth, Ray Patty was on the witness stand and available for interrogation by counsel opposite concerning the inconsistencies in his testimony.
Also, it was proper impeachment to elicit from the witness, Ray Patty, that he was afraid of the defendant. This is legitimate impeachment evidence going to the "untrustworthy partiality" of the witness. West, Handbook of Federal Evidence, Section 607.7 at page 432 (2nd Ed. 1986). The point of this inquiry is to expose to the jury the witness' special motive to slant, unconsciously or otherwise, his testimony. U.S. v. Abel, 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450, 451 (1984) (bias may be induced by fear, and bias is almost always relevant); Davis v. Alaska, 415 U.S. 308, 316-17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 354 (1974) ("the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."); see also, 3 Weinstein's Evidence, paragraph 607[03] at page 607-27, 39 (1987) (bias, due to fear, is clearly a basis for impeachment); Cantrell v. State, 507 So.2d 325, 330 (Miss. 1987) (bias is always material).
There is no merit to this assignment of error.

II.

THE COURT ERRED IN ALLOWING THE STATE TO CALL POLICE OFFICER WILLIE JOE COLEMAN FOR THE PURPOSE OF IMPEACHING ITS OWN WITNESS, RAY LEE PATTY.
We repeat that the voucher rule is no longer in effect in this State. Also, this was proper impeachment.
A proper predicate for impeachment had been laid. Carlisle, supra. Impeachment can be accomplished through the introduction of extrinsic evidence. M.R.E. 613(b); Hubbard v. State, 437 So.2d 430, 434-35 (Miss. 1983). Third, M.R.E. 613(b) was complied with in that the witness Ray Patty was given an opportunity to explain or deny his statements, and Patty was available for interrogation by opposing counsel. Officer Coleman was likewise available for interrogation by counsel for the defendant.
The prior statements of Ray Lee Patty to Officer Coleman were inconsistent with his testimony at trial. On direct and re-direct, Patty denied telling Officer Coleman that he "heard Annie Ruth hollering," or that the defendant kept saying he "had messed them up." It was proper, therefore, to elicit from Officer Coleman that Patty had previously made these statements. It is clear without reference to authority that a flat denial by a witness constitutes an inconsistency subject to impeachment.
As to the third statement, Patty testified on direct that he had no memory of telling Officer Coleman that the defendant showed him "a Dutch knife with blood on it." This differs from the previous two statements because it involves a faulty memory and not a flat denial. Nonetheless, Officer Coleman was allowed to testify that Patty told him on a prior occasion that Harrison showed him (Patty) a knife with blood on it. Patty clearly remembered seeing the knife, but he did not *180 remember seeing blood on it, or giving Officer Coleman a statement to that effect.
The Federal Courts are not in agreement on whether a mere lack of memory can be impeached. U.S. v. Grubbs, 776 F.2d 1281, 1287 (5th Cir.1985). It appears that the Second and Eighth Circuits leave the question of whether a lack of memory is an inconsistency to the judge's discretion. Id. The Fifth Circuit, however, has held "that a claim of faulty memory does not constitute an inconsistent statement." Id.
But in Mississippi, prior to the enactment of the rules, our Supreme Court has held that where a witness claims not to recall making a statement, the witness' lack of recognition is essentially a denial. In Magness v. State, 106 Miss. 195, 63 So. 352 (1913), a witness stated that he did not remember making a certain statement before the grand jury. 106 Miss. at 197, 63 So. 352. The State, in rebuttal, was allowed to introduce evidence that he did in fact make the statement being asked about. Id. This Court stated that when a witness is given an opportunity to admit or deny the making of a statement, as he must be, his refusal to admit or deny making the statement opens the door for impeachment. 106 Miss. at 198, 63 So. 352.
If we accept that unwilling witnesses may take refuge in a failure to remember, then the Mississippi approach seems to be most in accord with the broad relevancy rule stated in Rule 401 and the wide discretion granted to the trial judge in Rule 403.
Under the Mississippi Rules of Evidence, this approach is most consistent with the rules of relevancy, and with the "development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." M.R.E. 102. When a witness fails in any manner to acknowledge the making of a statement, the impeacher is obligated to offer proof establishing the making of that statement, assuming, of course, that the issue is relevant. The trier of fact must have a valid means to decide whether the witness' claimed lack of recollection is anything more than a "refuge." By being apprised of this prior statement, the trier has such a means.
There is no merit to this assignment of error.

III.

IT WAS ERROR TO INTRODUCE AN ALLEGED WRITTEN CONFESSION OF APPELLANT AS THE PROOF SHOWED THAT DEFENDANT COULD NEITHER READ NOR WRITE AND DID NOT UNDERSTAND THE CONTENTS OF THE WRITTEN STATEMENT TAKEN BY POLICE OFFICERS IMMEDIATELY AFTER HIS ARREST.
Here Harrison argues that his limited education, his trauma from the crime, and the time and place of the interrogation prevented him from making a voluntary confession based on a knowing and intelligent waiver of his constitutional rights. The record is, however, to the contrary.
At the separate suppression hearing required under Agee v. State, 185 So.2d 671, 673 (Miss. 1966), and White v. State, 495 So.2d 1346, 1347 (Miss. 1986), the State established a prima facie case with the testimony of Officer Greg Clark that Willie D. Harrison was given his Miranda warnings. Clark testified that he read Harrison his rights carefully. He further explained to Harrison what they wanted to question him about. Clark then took Harrison's statement down on paper as the defendant recited it to him. Finally, Clark read this statement back to the defendant, word for word, whereupon Harrison acknowledged its accuracy and signed it.
Harrison testified on his own behalf that he had only a third grade education, and could neither read nor write very well. Harrison did admit, however, that he passed a written test to get his driver's license, and that he had recently made arrangements to buy a new home. Harrison also testified that no promises or threats were made to induce him into confession.
At the conclusion of the suppression hearing, the trial judge made the following ruling:
BY THE COURT:

*181 The Court is going to find that I've seldom had a suppression hearing where the proof was more convincing and beyond a reasonable doubt that the confession was voluntarily and intelligently and knowingly given, and I find that as a finding of fact and as a conclusion.
Where the defendant claims to have lacked the mental capacity to understand the warning, the determination of the trial judge, who has seen the defendant on the stand, must necessarily be given great weight. Lee v. State, 338 So.2d 399, 401 (Miss. 1976).
The trial court found the confession of Harrison admissible, and this finding "becomes a finding of fact which will not be reversed on appeal unless it is manifestly in error or contrary to the overwhelming weight of the evidence." White, supra, quoting Cabello v. State, 490 So.2d 852, 856 (Miss. 1986).
The record shows only that Harrison was uneducated; it does not reveal any lack or impairment of understanding. There is no merit to this assignment of error.

IV.

THE STATE'S PROOF WAS INSUFFICIENT FOR A CONVICTION OF MURDER, ESPECIALLY SINCE THE STATE FAILED TO CALL THE ONLY EYEWITNESS, "MOON" HERRINGTON, AS A WITNESS, AND THE COURT SHOULD HAVE INSTRUCTED THE JURY THAT THEY COULD FIND THE DEFENDANT GUILTY OF NO GREATER CRIME THAN MANSLAUGHTER.
It appears that at the close of the State's case, the defendant moved very generally for a directed verdict. When that motion was overruled, the defendant then proceeded to put on his case, waiving his previous motion. Ruffin v. State, 481 So.2d 312, 316 (Miss. 1985).
Harrison argues on appeal that the State's proof failed to support the theory of murder, especially since the State failed to call Herrington, the only eyewitness other than the defendant. Neither Harrison's directed verdict motion, nor his motion for new trial mentioned the State's failure to call Herrington.
The defendant is procedurally barred from raising this issue for the first time on appeal. Crenshaw v. State, 520 So.2d 131, 134-35 (Miss. 1988); Warren v. State, 456 So.2d 735, 738 (Miss. 1984).
In the interest of justice, however, the merits of this claim will be considered, along with the other issues raised by this assignment of error.

FAILURE TO CALL "MOON" HERRINGTON
As authority for Harrison's claim that the State's failure to call Herrington fatally flaws the conviction, the defendant cites the ancient rule of the common law requiring the prosecution, in criminal cases, to introduce all the eyewitnesses to the crime.
There is some doubt that this rule was ever anything more than a matter of custom between the English Bench and Bar. In fact, this custom apparently developed as an offshoot from the practice of calling all witnesses whose names were endorsed upon the indictment. Notwithstanding, the notion of such a rule became firmly established only in Michigan, while elsewhere it has been either modified or repudiated altogether. 7 Wigmore, Evidence, Section 2079 (Chadburn Rev. 1978).
In Mississippi, the rule has received general recognition, but with some modification. An issue was presented to the Mississippi Supreme Court in Morrow v. State, 57 Miss. 836 (1880). The Morrow court viewed the English rule, as adopted by the Michigan Supreme Court, as a rule making it impermissible for the prosecution to "present an isolated part of the res gestae without a full development of all that occurred," and not "a declaration that it must examine all the witnesses who were present at the transaction." Id. at 838. While refusing to repudiate the rule entirely, the court in Morrow placed the enforcement of the rule in the sound discretion of the trial court. In the court's words:

*182 If the prosecuting officer should content himself with proving the bare fact of killing by one who had witnessed that act only, resting his case upon the legal presumption of guilt thereby implied, and if it was made evident by the testimony produced that there were other witnesses present who saw the whole transaction, it would, we think, be always within the sound discretion of the court to compel their production by the State, if in attendance or easily attainable.
Whether a refusal to exercise such discretion could ever be ground of reversal, we will not decide, except to say that it could only be so where it was made to appear that actual injustice had been done to and injury sustained by the accused, as where he had been compelled by such imperfect presentation of the facts, and by the legal presumptions thereby raised, to produce as his own a witness with strong bias against him, whose testimony militated against the general theory of his defence. When such a case is presented, we shall be in a better situation definitely to settle the point. No such case is before us.
57 Miss. at 838-839.
The rule of Morrow, adopted with modification from the common law custom, has been subsequently followed in Mississippi. See Hale v. State, 72 Miss. 140, 144, 16 So. 387, 388 (1894); Carlisle v. State, 73 Miss. 387, 395, 19 So. 207, 208 (1896); Patty v. State, 126 Miss. 94, 98, 88 So. 498 (1921), Mitchell v. State, 171 Miss. 4, 6-7, 156 So. 654, 654-55 (1934), Ross v. State, 185 Miss. 438, 188 So. 295 (1939), Sullivan v. State, 213 Miss. 14, 27, 56 So.2d 93, 100 (1952), and Phillips v. State, 183 So.2d 908, 911-12 (Miss. 1966).
The upshot of these cases is that the State is required to put some, but not all, of the eyewitnesses to a crime on the stand. If the State is always required to put on some eyewitnesses, then a fortiori, when there is only one eyewitness, the State must introduce that eyewitness. We must question whether the trial court has any discretion when requested by the defendant to compel the introduction of a sole eyewitness. The broader question we must ask, however, is whether such a rule is justified in modern day criminal practice.
When we examine the reason for the rule, it has no justification in modern day criminal practice. According to Wigmore, the singular argument in favor of this so called rule "is that the burden and risk of calling a hostile witness ... should fall upon the prosecution rather than upon the accused." 7 Wigmore, Evidence, Section 2080 at page 542 (Chadburn Rev. 1978).
Clearly, the purpose behind the rule requiring the State to introduce at least some eyewitnesses is the voucher rule.
However, the voucher rule is no longer the rule in Mississippi. It is clear, therefore, that the singular purpose behind the "ancient common law rule" being argued by Harrison has been stripped away. A defendant can no longer claim any restrictions on calling witnesses as his own. Consequently, we are left with a rule which, once stripped of its purpose, serves no purpose at all.
In addition, the defendant's access to and use of the witness in this case was guaranteed by the compulsory process clauses of the Federal and State Constitutions. U.S. Constitution Amendment VI; Mississippi Constitution, Article III, Section 26; Gray v. State, 472 So.2d 409 (Miss. 1985), reversed on other grounds, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Furthermore, the Sixth Amendment right of confrontation "does not impose upon the government the duty to call a particular witness," or to call all witnesses who are competent to testify. U.S. v. Bryant, 461 F.2d 912, 916 (6th Cir.1972); U.S. v. Polisi, 416 F.2d 573, 579 (2nd Cir.1969) (the Sixth Amendment safeguards the right of cross-examination, but it does not require the calling of any particular witness); Clingan v. U.S., 400 F.2d 849, 851 (5th Cir.1968).
Harrison could have called Herrington to testify. His right of confrontation under the Sixth Amendment was satisfied by the available opportunity to examine the witness. The right of confrontation gives the *183 prosecutor discretion in putting on his case, and does not require that all witnesses to a crime be called by the prosecution. U.S. v. Heck, 499 F.2d 778, 789 (9th Cir.1974); U.S. v. Harper, 460 F.2d 705, 706 (5th Cir.1972). Admittedly there are cases where the prosecution, as a matter of due process, will be required to call a witness who the State believes will offer exculpatory testimony. U.S. v. Bryant, supra; Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). These cases, however, can be decided by reference to the constitutional guarantee of due process without resort to any common law rule requiring the prosecution to call certain witnesses. The principle does not apply in this case because Harrison admits that the witness, Herrington, was not favorable to the defense. Similarly, there is no hint that this case presents "unusual circumstances" involving the prosecutor's attempt to knowingly conceal exculpatory evidence. See U.S. v. Bryant, supra.
Harrison had equal access to the witness, Herrington, and he would not have been limited in his examination of Herrington by the voucher rule. Therefore, to the extent that the Mississippi cases heretofore cited endorse, in any fashion, a rule requiring the prosecution in criminal cases to introduce certain witnesses, those same cases are hereby overruled. The fundamental, constitutional guarantees of an accused in a criminal case provide an adequate benchmark by which issues such as this can be decided. There is no longer a need, if ever there was one, for this so called "ancient rule of common law."[2]
The primary claim disposed of, the only question remaining is whether the evidence is sufficient to support the jury's verdict. The jury was instructed on murder as well as manslaughter and returned a verdict of murder. Harrison argues, that because of insufficient proof as to malice, the evidence could support nothing more than a verdict of manslaughter.
Malice aforethought is the single most important element of murder, and serves to distinguish murder from manslaughter. Taylor v. State, 452 So.2d 441, 443 (Miss. 1984); Patterson v. State, 289 So.2d 685, 687 (Miss. 1974). Malice may be established expressly or impliedly from the evidence. Motley v. Smith, 172 Miss. 148, 152, 159 So. 553, 554 (1935).
The homicide in this case is undisputed. The defendant's voluntary confession admitting the killing was received into evidence. Furthermore, there is ample evidence to support the jury's finding of malice, and ultimately murder.
When the evidence, together with all reasonable inferences to be drawn therefrom, is viewed in the light most favorable to the State, it is clear that there is sufficient support for the verdict, and the defendant's request for a peremptory instruction was properly denied. Ruffin v. State, 481 So.2d 312, 316 (Miss. 1985). Similarly, defendant's motion for new trial was properly overruled, there being no "unconscionable injustice" resulting therefrom. Id. at 317.
There is no merit to this assignment of error.

V.

THE COURT ERRED IN REFUSING TO GRANT A MISTRIAL WHEN ONE OF THE JURORS LEFT THE JURY ROOM DURING DELIBERATIONS AND CAME INTO THE JUDGE'S CHAMBER AND REQUESTED TO BE RELIEVED FROM THE JURY.
The jury retired to consider the outcome of this case at approximately 5:50 p.m. At approximately 6:22 p.m., Juror Hathorn left the deliberations and asked the trial judge to be excused. Juror Hathorn was in the custody of the bailiff at all times. The judge informed her that she could not be disqualified, whereupon she returned to the deliberations. At approximately 6:30 p.m., the jury returned with a *184 verdict of murder. A poll of the jury revealed the verdict to be unanimous.
From this scenario, Harrison argues that a compromise verdict was reached, necessitating a reversal. Harrison relies on Fairley v. State, 467 So.2d 894 (Miss. 1985), cert. denied, 474 U.S. 855, 106 S.Ct. 160, 88 L.Ed.2d 133 (1985), wherein a juror asked to be excused because the jury was not going to reach the verdict he supported. 467 So.2d at 900. That particular juror wanted to find the defendant guilty of capital murder but the remaining jurors were leaning toward murder. The judge replied that he could not excuse the juror for that reason. After further deliberations, a murder verdict was returned. We affirmed, holding that no prejudice to the defendant was shown, even though the juror compromised in favor of a lesser verdict.
In this case, Juror Hathorn gave no reason for her request, and Harrison can only speculate that she compromised her independence when she returned to the jury room. There is simply no evidence to suggest that Juror Hathorn did not support the verdict reached in the case. There is not even a scintilla of evidence in the record to suggest that the judge's response to Juror Hathorn prejudiced the defense.
Under ordinary circumstances, the judge and jury should engage in as little dialogue as possible. Martin v. State, 415 So.2d 706, 708 (Miss. 1982). But unlike Martin, the judge's response in this case did not amount to an oral instruction, and did not raise the presumption of impurity that can result from excessive verbal exchanges between a judge and juror.
Given the infinite possibilities of error which can occur in a finite trial, something more than the hyperbolic assumptions offered by Harrison must be shown before a verdict will be discarded on this ground. Therefore, this assignment of error is also without merit.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT ARE HEREBY AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
HAWKINS, P.J., specially concurs.
HAWKINS, Presiding Justice, Specially Concurring:
I concur Harrison is procedurally barred without end. On the merits, I concur that even if Harrison had made the appropriate motion during the trial, the circuit judge would not have erred in overruling it. The Mississippi decisions cited by the majority hold that the Court would not have abused its discretion in overruling such a motion.
My concern with the majority opinion is that in "destroying" a rule which never existed in Mississippi in the first place (the English rule stating it to be the duty of the prosecution to call all eyewitnesses), we are destroying another rule which does prevail, and has a great deal of validity  and just as much today as it ever did.
A true transgression of this rule is rarely  indeed almost never  seen on appeal, because the jury has cured the error. At the same time it is a rule I believe this Court should never want to weaken.
The rule has nothing to do with "rules of evidence," but comes from fundamental beliefs of every American citizen:
1. It is the duty of the State to prove a defendant guilty, not the defendant's obligation to prove himself innocent in the first place.
2. It is the duty of every district attorney to be basically fair in presenting evidence; i.e., it is the district attorney's duty to protect the innocent as well as prosecute the guilty.
3. Recognizing the very wide discretion a district attorney has in putting on the State's proof, there can be a limit, and if a trial judge perceives the State trespassing beyond that latitude, he is not powerless to require the State to fairly present the available evidence in the case.
The present opinion removes all three of the above considerations. The Mississippi *185 decisions which the majority cites and now declares obsolete embody these principles.
The quote from Morrow v. State, 57 Miss. 836 (1880), supports the above principles nicely.
Here two hypotheticals:
Three disinterested eyewitnesses are present at a homicide in which A, the decedent, armed and clearly the aggressor, is slain by B acting in self-defense (according to all three eyewitnesses). The State only produces W, the widow of A, the decedent, whose story is radically different from the three eyewitnesses. The State technically makes out a case of murder by the widow's testimony.
Same scenario, only this time no widow is present. After B shoots A, he goes next door to the city hall, tells the police dispatcher he has just shot A, and gives the dispatcher his pistol. The sheriff comes and arrests B, and B gives the sheriff a full and detailed story of how he had to shoot A to keep from getting killed himself. Now, technically, the State can make out a case of murder against B by putting on the undertaker to prove A is dead and had a bullet hole in his head, and the little girl dispatcher who testifies that B informed her he had shot A. The unexplained killing of a human being with a deadly weapon is presumed to be murder. McDaniel v. State, 8 Smedes and Marshal, 401 (1847); Hawthorne v. State, 58 Miss. 778, 787 (1881).
Are we going to say that a circuit judge hearing just the proof that State put on in the above examples could not require the State to put on at least some of the eyewitnesses? If we permit this, then it is not the State which is being required to prove a man guilty, but the defendant who is being required to prove himself innocent. That B, in these hypothetical examples, might incur no difficulty in establishing his innocence is no justification to require him to do so.
This is the sort of situation to which Morrow alluded, and it is good law. The State has the widest possible latitude in determining what witnesses it will, and what witnesses it will not call. In the thousands of cases we have had on appeal in this State, invariably the State will have called some of the eyewitnesses and the defense others, and there has been no problem whatever with this practice.
Yet, no circuit judge should be powerless to prevent an overly-zealous prosecuting attorney from failing to call vital witnesses, or using some presumption when witnesses are available, and thereby presenting a warped, or incomplete picture to the trial jury.
The rule Wigmore attacks, the requirement that the State call all eyewitnesses in a prosecution, has never prevailed in Mississippi. I read both Sections 2079-2080 cited by the majority, and nowhere does he suggest the rule prevailing in Mississippi should be abolished. If he did, I would lose part of my profound respect for the Professor.
This Court has never remotely held that it was the duty of the prosecution to produce all eyewitnesses. Virtually every homicide case we have on appeal has several eyewitnesses in which some will have testified as State witnesses and some as defense witnesses. Nor, have we ever required that the State produce any particular eyewitness, or even the sole eyewitness. Hale v. State, infra.
The fundamental issue is the right to a fair trial, the right to be proven guilty, and not have to prove your own innocence, and the duty of a prosecutor to protect the innocent as well as prosecute the guilty, and that the presentation of the State's evidence have at least some basic fairness about it. Finally, it has to do with the authority a trial judge should have, and should exercise, when he sees a prosecution that is unfairly distorted by some unscrupulous or overly-zealous prosecuting attorney.
In Hale v. State, 72 Miss. 140, 144, 16 So. 387, 388 (1894), this Court stated:
The action of the court below in refusing to compel the state to introduce as its witnesses the eyewitnesses to the homicide, was not error. The eyewitnesses *186 were the accused himself, his co-defendant, Robertson, from whom he had obtained a severance, and who was not then on trial, and Roxie Hall, a sister of the accused. Each of these persons, we may reasonably suppose, would be in sympathy with the defendant, and would testify as favorably as possible in his behalf; and, in the opinion of counsel for the state, the evidence of none of them was necessary to make out the state's case. The defendant himself was examined as a witness on his own behalf, and his co-defendant, not on trial, was also introduced by and testified for him. The evidence, thus offered by the defense, of eyewitnesses was most favorable to its theory of the case, and no injury was sustained by the defendant thereby. We content ourselves by declaring that no injury was sustained by the defendant by the action of the court complained of, and that no reversal, on this ground, can be had. The point is clearly ruled by Morrow v. State, 57 Miss., 836.
In Carlisle v. State, 73 Miss. 387, 395, 19 So. 207, 208 (1896), this Court dealt with a man convicted of seducing a young lady. The State did not put her on the stand, and the defendant had to. When he complained on appeal, we held:
The question involved was discussed by this court in Morrow v. State, 57 Miss., 836, in which case this court, while doubting the accuracy of the rule laid down by Judge Ruffin in State v. Martin, 2 [Ired.] Ind., 120, "that it was the province of the solicitor, and not of the court, to determine who should be the state's witnesses," declared that, if the action of the court in this respect could be at all assigned for error, a clear abuse of judicial discretion must be shown to warrant a reversal.
We are of the opinion that no abuse of discretion here appears. The whole evidence shows that Miss Broom was not an unfriendly witness to the defendant, and her own testimony, if credited by the jury, would have secured his acquittal. Though the law visits its penalty on the seducer only, it does not follow that the woman is viewed wholly as his victim, and herself free from fault. The proof of his guilt is that of her shame, and circumstances may frequently exist, as here, under which acquittal of one undoubtedly guilty would result if the testimony of the woman were received as true. We do not think the state should be required to produce and vouch for any witness, even though, in the nature of things, he must know all the facts, when the probabilities are that he will, by false swearing, attempt to establish the innocence of the accused.
73 Miss. at 395-396, 19 So. at 208.
Rule 607 of our Mississippi Rules of Evidence dispenses with this "voucher" rule. The fact that we have done away with the "voucher rule" should not make it less, but more important that the State be required in those exceptional cases to produce important or vital witnesses. No longer does the State have to "vouch" for their veracity.
Patty v. State, 126 Miss. 94, 98, 88 So. 498, 499 (1921), comes very close to one of my hypotheticals, but even there the Court did not reverse for failure of the State to call an eyewitness. In that case the State did not produce the widow of the deceased, an eyewitness. Instead, it used the admission of the defendant that he had stabbed the deceased and the presumption of malice. We held:
In the case before us the state did not introduce the wife of the deceased, and, in the absence of her evidence, which ought to have been produced if she could be obtained, we are bound to conclude that the testimony of the defendant and his witness is true. Wherever there are eyewitnesses to a killing, or where there are witnesses who could produce the facts as to the origin of the difficulty or of the crime, and it is not done, this is a circumstance favorable to the defendant. The state ought to produce available witnesses, and not rely upon mere circumstance and presumptions, where such proof may be produced. [Emphasis added]
*187 In Mitchell v. State, 171 Miss. 4, 156 So. 654 (1934), Mitchell and Steve Bethel, Jr., were indicted for murder. Bethel and Mitchell were questioned together by the sheriff and a deputy. Bethel in Mitchell's presence gave a confession which, if true, would have proved Mitchell guilty of murder. Mitchell, on the other hand, denied he had anything to do with the killing.
At trial, the State did not produce Bethel as a witness, even though he had been granted immunity, but instead used his confession as proof of Mitchell's guilt. Mitchell's attorney objected on the ground that the State had the duty to put Bethel on the stand.
On appeal the attorney general conceded it was error for the State to use the confession of Bethel in evidence against Mitchell, but the point had been waived because Mitchell's attorney had not objected on the ground of hearsay, the only ground upon which it was inadmissible.
This Court answered:
[T]he evidence was inadmissible on both grounds. It was the duty of the court to rule out the evidence on the specific objection made by the appellant. It was the common-law rule that it was the duty of the state to call at least some, if not all, of the eyewitnesses to the alleged crime. This rule has been modified to some extent but not wholly abrogated. The State is not released from this duty unless the res gestae has been established by eyewitness or eyewitnesses. It was the duty of the district attorney to ascertain from Bethel what his testimony, would be, and, if it tended to prove appellant's guilt, then put him upon the witness stand. On the other hand, if he ascertained that Bethel's testimony did not tend to show appellant's guilt, it was his duty to nol. pros. the case, because there was no evidence left tending to sustain it... . [Emphasis added]
171 Miss. at 7-8, 156 So. at 654.
Ross v. State, 185 Miss. 438, 448, 188 So. 295, 297 (1939), explained:
The State introduced two of the eyewitnesses, but two others, Reck and Frishman, were not introduced either by the State or by the defendant. Appellant moved the court that he permitted to introduce Frishman, but to be allowed in so doing to treat him as if an adverse witness. The motion was overruled.
The ancient rule of the common law required the prosecution to introduce all eyewitnesses to the homicide; but this rule has been modified in this state, so that when some of the eyewitnesses have been introduced by the state, the failure by the state to introduce the others or the refusal by the court to allow them to be examined as if witnesses for the state is not error, in the absence of rarely exceptional circumstances. See Morrow v. State, 57 Miss, 836; Hale v. State, 72 Miss. 140, 16 So. 387; Carlisle v. State, 73 Miss. 387, 19 So. 207; Patty v. State, 126 Miss. 94, 88 So. 498; Mitchell v. State, 171 Miss. 4, 156 So. 654. [Emphasis added]
In Sullivan v. State, 213 Miss. 14, 27, 56 So.2d 93, 100 (1952), the defendant was charged with manslaughter as a result of a motor vehicle collision. The driver of the other truck in which the deceased was a passenger was not produced by the state as a witness. This Court noted that the State produced a number of witnesses, and was under no duty to call the other truck's driver, that the defendant could have called him if he wished to do so.
Finally, in Phillips v. State, 183 So.2d 908 (Miss. 1966), the defense counsel remarked before the jury that a certain witness should have been called by the State, and the county attorney responded that if the defense wanted him they could have subpoenaed him themselves. We held this was a proper rejoinder.
The above decisions would clearly uphold the right of the State in this case not to call Herrington. The State proved murder, not by some presumption, or an inference drawn by some witness who saw only part of the homicide, but a confession from Harrison himself. Why should the State be required to produce Herrington? Not under our decisions.
*188 I attempted to make this point in Hogan v. State, 516 So.2d 474, 481-82 (Miss. 1987), but obviously quite ineptly, because the majority opinion knocks it over as well.
We should leave these matters in the discretion of the circuit court, recognizing that in practically all instances the State's method of calling witnesses will be approved, yet also acknowledging there can be occasions when a circuit court can, and should require the State to call a witness.
A defendant is entitled to a fair trial, and it is not the technical nicety of requiring every witness, or invariably any particular witness, but the spirit, which says the State should put on a fair presentation.
In State v. Barrett, 33 Ore. 194, 54 P. 807, 809 (1898), the Oregon Supreme Court, while holding it was not reversible error for the State not to have called certain eyewitnesses, made this observation:
It is true, the prosecuting officer is supposed to be, and should be, wholly without bias or prejudice. His sole duty is to see that the laws are enforced, and the guilty punished. He is as much bound, as the law officer of the state, to protect the innocent as to punish the guilty; and if, therefore, at any time he should, unmindful of his duty, endeavor to suppress evidence, the trial court would be justified in requiring the production by him of the evidence sought to be suppressed, although it might be more favorable to the defense than to the state. And a refusal to exercise such discretion would probably be ground for reversal.
Rice v. Commonwealth, 102 Pa. 408 (1883) was another seduction case. In the presence of mama, papa, and the wronged young lady, the defendant was supposed to have made a certain statement which barely got the case to the jury. The Supreme Court, while recognizing it was not necessary for the state to put the daughter on the stand, held it should have been required to produce her father.
But under the circumstances of this case it was the plain duty of the Commonwealth to have called her father. This was more necessary by reason of the equivocal character of Mrs. Robertson's testimony, as well as that of her daughter. The Commonwealth demands justice, not victims. This belongs to a class of cases where the whole truth should be brought out if possible. [Emphasis added]
102 Pa. at 411.
In United States v. Myers, 327 F.2d 174 (3rd Cir.1964), in a habeas corpus proceeding, the Court of Appeals for the 3rd Circuit recognized an instance of failure to produce an eyewitness denied a defendant a due process fair trial.
To engage in a semantic argument whether Irving fits within the definition of an eyewitness, is to provoke a needless discussion... . Calling him could have elicited relevant and material facts contributing to a determination of the truth. And not only may a trial judge, as a proper exercise of his discretion, direct the prosecution to call eyewitnesses to the crime, but any additional witnesses that are necessary to elicit relevant and material facts contributing to a determination of the truth. Drew, it is clear, had the right "to have all of the facts connected with the [alleged illegal possession and sale of narcotics] ... fully and fairly disclosed by the prosecution... .
* * * * * *
[F]or although the prosecutor must have a large measure of discretion in presenting his case, manifestly he is a quasi-judicial officer and should be motivated by a judicial attitude." [Brackets in original; footnotes omitted]
327 F.2d at 179-181.
In Keys v. State, 337 A.2d 18 (Del. 1974), the State offered the statement made by a co-defendant implicating the defendant in the crime. This was done under a Delaware statute which permitted it, so long as the declarant was available as a witness to either side. The co-defendant was given immunity from prosecution, and was clearly available as a witness for the state. The trial court offered the defendant Keys the opportunity to call the co-defendant as his witness, but he declined to do so. In condemning *189 this, the Delaware Supreme Court held:
This scene dramatizes the chief issue in this appeal. The prosecution, instead of bearing the burden of sponsoring as a witness the out-of-court declarant [who, for a while at least, appears to have been an accomplice and who had been granted immunity and whose testimony is thus doubly suspect], is able to present the out-of-court statement through an officer of the law and an officer of the Court. Additionally, the burden is shifted to the defendant to call the witness and it thus appears to the jury, regardless of technicalities of cross-examination and formal vouching for the witness, that the defendant is sponsoring the witness or refusing to sponsor him. That burden is not fair. If the State carried its position to its logical extreme, the State could rest its case without calling a single eyewitness to any pertinent fact. That is not a trial as we know it. The State should not be able to rest its case without calling the witnesses it relies upon to prove it. This is particularly true when the State relies on witnesses who have obvious vulnerability as to credibility.
337 A.2d at 23-24.
Indeed, the rule works both ways. There can be instances when a court cannot be faulted even though the evidence brought out by the trial judge hurt the defense. In State v. Spicer, 3 Or. App. 120, 473 P.2d 147, 151-152 (1970), the Oregon Court of Appeals noted:
Neither justice nor its administration is a game. Nor is the judge just an umpire. Rather, the judicial process is that procedure within an ordered society through which its previously expressed will is first determined and then imposed. In deciding a factual issue in an individual case, its highest purpose is to seek the truth within the established rules.
* * * * * *
When in the discharge of its responsibilities the court finds it reasonably necessary to direct the production of evidence not offered by one of the parties or to question a witness, it has both the right, and, upon occasion, the duty to do so.
Two United States Supreme Court cases hold it the obligation of the prosecution to make a fair presentation. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406 (1935).
In criminal cases in which the State seeks to introduce a confession, it cannot do so simply by proving the defendant signed it. It is first incumbent on the state to show it was freely and voluntarily given. Also, when the State seeks to offer evidence of a search of a defendant's property, it is first incumbent upon the State to prove the search was lawful.
I fear we are in effect overruling sound cases, and making obsolete a basic principle of fairness generally recognized by courts. Our Mississippi rule prevails in most states, except that those one or two where they require all witnesses be produced by the State.
NOTES
[1] Miss.S.Ct.R. 11 repealed by new Mississippi Supreme Court Rules, effective January 1, 1988.
[2] This rule is stated in Hogan v. State, 516 So.2d 474, 482 (Miss. 1987), but it is merely obiter dicta in that case. Therefore the elimination of this rule has no effect on the decision in Hogan except that the rule no longer serves as a valid illustration of the principles enunciated therein.